# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-KA-01569-SCT

*BRENDA LOUISE REYNOLDS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/12/2000 |
| TRIAL JUDGE: | HON. LILLIE BLACKMON SANDERS |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PATRICIA F. DUNMORE |
| | DAVID M. READ |
| | CARMEN N. BROOKS |
| | DEBORAH McDONALD |
| | BRENDA LOUISE REYNOLDS (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: W. GLENN WATTS |
| DISTRICT ATTORNEY: | RONNIE LEE HARPER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/14/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE COBB, P.J., EASLEY AND CARLSON, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1.     Brenda Louise Reynolds (Reynolds) was indicted on the charge of murder in Adams County, Mississippi.   Reynolds was tried and found guilty of murder by a jury and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections by the Circuit Court of Adams County, Mississippi.    Reynolds filed a motion for judgment

notwithstanding the verdict which was denied by the trial court following a hearing on the motion. Reynolds now appeals to this Court.

## FACTS

¶2.     On July 7, 1999, at approximately 2:15 a.m., the Natchez Police Department received a call regarding an assault that had taken place at 573 West Stiers Lane, Natchez, Mississippi. Officers Joseph Belling and Ben Hewitt were dispatched to that location. The address was a boardinghouse. When the officers arrived, Reynolds and a gentleman directed them to the room where the assault occurred. The one-bedroom apartment in the boardinghouse belonged to the decedent later identified to be Larry Holliday (Holliday).

¶3.     The apartment door was cracked open. When Officer Hewitt looked inside Holliday's apartment, he discovered two legs behind the door lying on the floor. Officer Belling was also present when Officer Hewitt looked inside. Officer Belling testified that he saw the bottom half of a right leg form. Officer Hewitt pushed open the door and went inside. Officer Hewitt discovered what appeared to be a bullet wound. Officer Hewitt checked Holliday for vital signs, but he did not find any breathing or a pulse. Officer Hewitt radioed for an ambulance. Officer Hewitt testified that the room was too small for Officer Belling to enter while he was bent down checking the victim. Officer Belling remained in the hallway. Both Officer Hewitt and Officer Belling testified that Reynolds, who was standing behind the officers outside the room, was visibly upset and tried to enter the room. Officer Hewitt instructed Officer Belling to remove Reynolds.

¶4.     Officer Tom McGehee, sergeant of patrol with the Natchez Police Department, arrived at the scene. Officer Hewitt secured the scene and waited for the criminal investigation

2

division to arrive. Officer Hewitt testified that there was signs of what appeared to be blood on the walls. There were specks of blood by the door where Holliday's body was discovered.

¶5. Officer Belling testified that he exited the boardinghouse and stayed on the front porch with Reynolds until she was taken by Officer Don Boyte to the Natchez Police Department. While on the front porch, Officer Belling testified that Reynolds explained why she was upset and crying. According to Officer Belling, Reynolds told him that she had gone to Holliday's house in reference to a black leather hat. When they got to Holliday's house, she walked up the steps first with Holliday following her. She entered Holliday's room first. When Holliday followed her inside and began to shut the door she heard a loud bang, Holliday yelled her name and fell to the floor.

¶6. Officer Boyte testified that he transported Reynolds to the police department on the early morning hours of July 7, 1999. He testified that there were blood spots on the white skirt that Reynolds was wearing. He identified State's Exhibit T as being a photograph of Reynolds as she appeared the morning that he transported her. He testified that the photograph reflected the blood on her skirt.

¶7. Officer McGehee responded to the scene as shift supervisor when the felony call was received. He testified that the victim was seated with his back against the door of the room. Officer McGehee identified State's Exhibit 2 as being a photograph depicting Reynolds and Exhibit 1 as a photograph depicting the mark he observed on Reynolds's left cheek.

¶8. Investigator Tonja Butler (Investigator Butler), an investigator with the Natchez Police Department, investigated the scene. She provided testimony as to her investigation of

Holliday's apartment and the photographs she took of the crime scene. She also testified that she assisted Investigator Gary Nations (Investigator Nations) in interviewing Reynolds.

¶9. Investigator Nations, an investigator in the criminal investigation division, testified that he and Investigator Butler interviewed Reynolds on the morning of July 7, 1999, at 4:57 a.m. Before being questioned, Reynolds was read her *Miranda* warnings, asked if she understood her rights and signed a waiver. Reynolds stated that she and the victim had gone to his apartment at 573 West Steirs Lane. The victim closed the apartment door. She then heard a noise, the victim called her name and fell to the floor. Investigator Nations testified that Reynolds was questioned extensively about anyone else being present.

¶10. Reynolds stated that she and the victim were the only two in the apartment and no one else was present anywhere in that area. Investigator Nations testified that Reynolds's clothes and shoes appeared to have blood on them. Reynolds stated that she was not sure how she got the scratch on her face, but the victim might have scratched her when he was falling and reached out for her. Reynolds stated that she got scared and left the apartment and went to a trailer at 618 Inez Street. She stated that she called her mother, and her mother and sister came to her at the trailer. When her mother and sister arrived, they went to see Holliday. Her mother and sister returned to the trailer and called the police.

¶11. Investigator Nations testified that Captain Mullens interviewed Reynolds. He observed Reynolds demanding that Captain Mullens do a gunshot residue test on her. When Investigator Butler came back with a gunshot residue test kit, Reynolds refused. However, the sample was taken.

¶12.    David Whitehead (Whitehead), a forensic scientist with the Mississippi Crime Laboratory, examined a standard gunshot residue evidence collection labeled as coming from Reynolds.    Whitehead analyzed the four vials contained inside the gunshot residue test kit. From his testing, he was able to positively identify one particle of gunshot residue on the right palm, particles of gunshot residue on the left palm and one particle characteristic of gunshot residue on the back of the right hand.    The one particle on the right palm and the particles on the left palm met all the characteristics of gunshot residue and was positively identified as gunshot residue by Whitehead.

¶13.    Dr. John Christopher Hancock (Dr. Hancock), a pathologist working out of the Natchez Regional Medical Center, performed the autopsy on Holliday.    He testified that Holliday had a gunshot wound to the mid-chest area.    There was no exit wound.    Dr. Hancock testified that the gunshot wound to the chest also indicated that the gun was fired at a very close range.    He stated, "I will say the one to the chest appeared to be actually in contact because there was a structure which resembled a barrel indent, impression site.    So this appeared to be actually in contact with the skin."

¶14.    Holliday also had a gunshot wound to the leg slightly below the right knee that had a clean through and through exit wound.    A third gunshot wound was in the vicinity of the left elbow with powder burns to indicate a very close contact-type wound.    He stated, "I'm talking about essentially, you know, held to the skin to a few inches away."

¶15.    Dr. Hancock testified that Holliday's death would have been a quick death due to the massive internal bleeding caused by the gunshot wound to the chest area.

¶16.    On appeal to this Court, Reynolds raises the following issues:

I.      Whether Reynolds was denied a fair trial due to the State's opening statement.

II.     Whether the trial court erred in refusing to grant the State's manslaughter instruction S-2 which the defense objected to the State being granted.

III.    Whether Reynolds was denied a fair trial due to the State's closing argument.

IV.     Whether the trial court erred in allowing the testimony that the substance appeared to be blood.

V.      Whether there was sufficient evidence to prove Reynolds guilty in a circumstantial case.

VI.     Whether Reynolds was denied a fair trial due to ineffective assistance of counsel.

## DISCUSSION

### I.    Opening Statement

¶17.    In the State's opening statement, the jury was informed that Vifran Carter (Carter) would testify that Reynolds told her that she had committed "this offense" [Holliday's murder]. The statement provided that while incarcerated Reynolds was housed with another inmate, Carter. The State informed the jury that Carter was a convicted felon who had a number of convictions and presently in the custody of the Mississippi Department of Corrections. The defense did not object to the State's opening statement concerning Carter.

¶18.    Carter was called by the State to testify at trial. Carter took the stand and testified as to her name, age, prior convictions, years spent in jail, and that she was currently incarcerated. **When the State began to question Carter about her conversation with Reynolds, the defense objected and asked to approach the bench**. The trial court excused the jury and conducted an extensive examination in chambers as to whether Carter should testify. Besides Carter who was examined outside the presence of the jury, other witnesses were also examined outside the presence of the jury primarily as to Carter's contact with and accessibility to

6

Reynolds while incarcerated and whether anyone recalled seeing them together or hearing them talking to each other. The witnesses that were examined in chambers were: Roosevelt Owens, Jr., Natchez Police Department Officer; Jeanette Cupit, Natchez Police Department jailer; Officer Jones, Natchez Police Department; Roger Dobbins, Natchez Police Department jailer; Rosetta Jones, Natchez Police Department jailer and Glenda Marie Washington, Natchez Police Department jailer.

¶19. After the trial court concluded its examination in chambers, the State elected to not call Carter back to the stand. The defense did not object to the State's withdrawing Carter from testifying as a witness. The following exchange transpired:

State: But to be perfectly frank with the Court, after all that's been said and all the testimony that has been given, the state is going to elect at this point and time not to call Ms. Carter and ask this Court to allow us to withdraw her as a witness and not call her as a witness for obvious reasons, Your Honor. And there are concerns that I have about her veracity. I don't know if that would be appropriate. I think it's a factual thing about her veracity and her credibility and that type of thing but in light of it, I'm satisfied I don't want to call her as a witness and I'll ask the Court to allow us to withdraw her as a witness.

Court: The Court will grant your motion to withdraw her as a witness. The Court has some problems about, I mean, about whether or not we need to go into some perjury by putting Ms. Carter on and I really have some serious problems with that. So I agree. She shouldn't be called, but I will grant your motion to withdraw.

¶20. When the jury was brought back in, the trial court instructed the jury that after some hearings in chambers that the jury was to disregard anything that Carter said. The trial court further stated that since Carter is not a witness in this case the jury was not to consider

7

anything that Carter said in its deliberations. The jurors responded that they understood the trial court's instructions.

¶21. In front of the jury, the defense requested that the trial court instruct the jury that references about Carter in the State's opening statement should be disregarded by the jury and that the opening statement is not evidence. The trial court granted the defense's request and stated to the jury:

> [A]nything other than what's put on in this witness stand is not evidence. Arguments of the attorneys, I'm going to give you an instruction about that. That's not evidence **so you are to disregard anything regarding Vifran Carter**.

(emphasis added).

¶22. The State contends that Reynolds waived this issue because Reynolds did not object to the State's opening statement regarding what Carter would testify to on the stand. In *Slaughter v. State*, 815 So.2d 1122, 1130 (Miss. 2002), the defendant argued that during opening statements the prosecution stated alleged facts that could not reasonably be expected to offer into evidence. This Court held that failure to make a contemporaneous objection waived the ability to challenge to the opening statement on appeal. *Id.* at 1131-32. *See Colburn v. State*, 431 So.2d 1111, 1113-14 (Miss. 1983) (an appellate court will not consider for the first time on appeal a claim of prejudice when the trial court was not given the opportunity to resolve it after a timely objection). *See also White v. State*, 847 So.2d 886, 890 (Miss. Ct. App. 2002) (during opening statement no objection was made procedurally barring the issue on appeal).

¶23. Here, the State began its opening statement by stating to the jury that:

> Now, this is opening statements. This is where the attorneys will have an opportunity to address you directly as a jury to tell you what we expect the

8

evidence to show. For the most part, kind of give you a road map to tell you where we expect to get and how we expect to get there.

When the State made its opening statement, it informed the jury that it expected Carter to testify and briefly what her testimony would show. The State intended to call Carter to testify when the State made its opening statement. In fact, the State did call Carter to testify, but as discussed above, based on the defense's objection and subsequent examination of the witness in chambers, the State asked to withdraw the witness. The trial court agreed. Carter was withdrawn before she testified as to the substance of her conversation with Reynolds.

¶24. The trial court then instructed the jury to disregard Carter's testimony and to disregard any reference by the State in its opening statement concerning Carter's expected testimony. The jury responded on the record that they understood the trial court's instruction. In *Bell v. State*, 631 So.2d 817, 820 (Miss. 1994), this Court held that there must exist a presumption that jurors follow the trial "court's admonition to disregard the unanticipated, unprovoked incident and decide the case solely upon the evidence presented; to presume otherwise would be to render the jury system inoperable."

¶25. The defense objected to Carter's testifying as to the substance of the conversation with Reynolds. The trial court conducted a hearing in chambers to examine Carter's testimony. Carter was withdrawn as a witness. **The trial court properly instructed the jury to disregard Carter's testimony and to disregard the State's reference to Carter in its opening statement.** We find this assignment of error to be without merit.

II.     Manslaughter Instruction, S-2A

9

¶26. On appeal, Reynolds argues that the trial court erred in not granting the State's lesser included offense/manslaughter jury instruction, S-2A. **The record reflects that the defense objected to the manslaughter instruction being granted.** When the State offered its manslaughter instruction, the following transpired:

Court:      What says the defendant?
Defense:    To which we object.
Court:      What's the basis of your objection?
Defense:    Substituting S-2 we object to on the grounds that **there is no evidence warranting a manslaughter instruction in this case.**

(emphasis added). The trial court did not grant the manslaughter instruction. Reynolds did not object to the refusal. Reynolds did not offer any manslaughter instruction.

¶27. The State contends that this issue is waived on appeal for the defense's failure to make a contemporaneous objection to the refusal of the instruction. In fact, not only did the defense not object, the defense objected that the State requested a lesser-included offense instruction. In *Nicholson ex rel. Gollott v. State*, 672 So.2d 744, 752 (Miss. 1996), the Court held that, "Gollott failed to object to the refusal of D-4. As a result, this Court is not bound to address the alleged error on appeal." (citing *Lockett v. State*, 517 So.2d 1317, 1332-33 (Miss. 1987)).

¶28. Furthermore, regardless of the fact that the defense objected to a manslaughter instruction being granted, the record does not reflect that a manslaughter instruction was proper. Based on the evidence presented, a manslaughter instruction was not warranted. Reynolds did not testify at trial. **In the statement Reynolds made to the police, Reynolds never stated that she shot or killed Holliday. She made no mention of any struggle, fight or any altercation with Holliday.** She told the police that she heard a noise, heard Holliday

10

call her name and fall to the floor.  **Nothing in that statement warrants a manslaughter instruction.**  Even Reynolds's defense, at trial, stated that a manslaughter instruction was not warranted by the evidence.  In *Presley v. State*, 321 So.2d 309, 310 (Miss. 1975), this Court said:

> [T]he jury should not be instructed as to a lesser-included offense in such a way as to ignore the primary charge as this would be confusing to the jury.  It is also true that **if the evidence does not justify submission of a lesser-included offense, the court should refuse to do so.**  Unwarranted submission of a lesser offense is an invitation to the jury to disregard the law.

(emphasis added).  *See Grace v. State*, 375 So.2d 419, 420 (Miss. 1979).

¶29.  We find that this assignment of error is without merit.

### III.    Closing Argument

¶30.  Reynolds argues that the trial court erred in allowing the State to make "allegedly false and misleading" statements in its closing statements.  The remarks came when the State followed the defense's close.  In part the State stated:

> Ladies and gentlemen, we have all had a very distinct pleasure this morning and honor.  I haven't tried a lot of cases with Mr. Pintard [defense] in quite sometime and he is by far in the way one of the last of a breed.  I didn't realize he was 70 years old myself.  But it is quite a treat and honor to be able to hear someone of his talent.  Scott, of course, did an excellent job.  He's an up and coming young lawyer.  They both do a good job, and they are here to do a good job today.  Ladies and gentlemen, don't ever forget one thing and that's that they do have a job here today.  And their job, their sole and only purpose for being here is to get you to let that lady go home.  Don't ever forget that.  That's what they are here for.  They have no other obligation or duty to anybody but her.

¶31.  The defense objected, and the trial court overruled the objection.  The State contends that the excerpt from the closing statement was in direct response to remarks made by the defense in its closing statement.  In the defense's close, he discussed his age:

11

I had a good looking woman walk up to me about two weeks ago and look at me real good and said, "Galee, you appear to be 50," and I showed her my identification card and I'm 70. So appearances doesn't necessarily mean facts.

The defense stated that all of the State's evidence is speculation. The defense further stated:

What does this Judge require you? She requires you to find this defendant guilty only on evidence beyond a reasonable doubt, not on conjecture, speculation, assuming, I think. This lady don't want to go to the penitentiary or anyone else on thinking, on believing.

¶32.    In *Slaughter*, 815 So.2d at 1132, this Court stated:

This Court has held that attorneys are allowed wide latitude in closing arguments. *Holly v. State*, 716 So.2d 979, 988 (Miss. 1998); *Wilcher v. State*, 697 So.2d 1087, 1010 (Miss. 1997). In addition, the "court should also be very careful in limiting free play of ideas, imagery, and personalities of counsel in their argument to [a] jury." *Ahmad v. State*, 603 So.2d 843, 846 (Miss. 1992). Any alleged improper comment must be viewed in context, taking the circumstances of the case into consideration. *Id.* **The trial judge is in the best a position to determine if an alleged objectionable remark has a prejudicial effect.** *Roundtree*, 568 So.2d at 1177.

(emphasis added). The trial court did not err in overruling Reynolds's objection.

¶33.    The defense also argues that the State should not have been allowed to make comments on the good job that the police do in its closing statement to bolster its case. **The defense did not raise a contemporaneous objection as to the State's remarks.** This Court has held that "[i]f no contemporaneous objection is made, the error, if any, is waived." *Walker v. State*, 671 So.2d 581, 597 (Miss. 1995) (citing *Foster v. State*, 639 So.2d 1263, 1270 (Miss. 1994)). On appeal, this Court is under no obligation to review an assignment of error when an objection was not made. *See Carr v. State*, 655 So.2d 824, 832 (Miss. 1995). The contemporaneous objection rule is designed to enable the trial court to correct an error with proper instructions to the jury whenever possible. *Gray v. State*, 487 So.2d 1304, 1312 (Miss.

1986) (citing ***Baker v. State*** 327 So.2d 288, 292-93 (Miss. 1976)).  *See also **Johnson v. State***, 477 So.2d 196, 210 (Miss. 1985).

¶34.  Furthermore, the remarks made by the State regarding the police department were made in reference to allegations raised by the defense on close.  The remarks were tied to addressing the defense's statements asking why Reynolds's clothes were not tested to see whose blood was on her clothes.  The State stated:

> I want to talk about why they didn't test all this blood.  Whose blood did you expect to be in there?  The guy that got shot.  They knew that he was.  They said, "why didn't they test her clothes?"  She told them she was in there.  Why would you test her clothes.  That cost[s] money to do.  Why would you test the clothes when she told you she's in there and got blood on it.  These people do a good job.  They did a good job on this case and it always appalls me when they get castigated in a case like this.

¶35.  We find this assignment of error without merit.

### IV.  Blood

¶36.  Reynolds argues on appeal that "the defense was unduly prejudiced by the [sic] Officer Butler's testimony that the spots were '**blood like**.'"  The defense argues that the trial court erred in allowing the testimony that the substance **appeared to be blood** over its objection. The State contends that the issue is waived as the objection actually made at trial "was never any objection as to [the] authenticity of the blood during trial or in Reynolds['s] motion for a J.N.O.V."  The record reflects that the objection was to the use of the word "blood," not to "appeared to be blood."

¶37.  The State cites ***Holland v. State***, 587 So.2d 848, 868 (Miss. 1991), in support of its position.  In ***Holland***, this Court found that failure to raise an issue at the trial court on the same grounds as argued on appeal waives the issue.  The Court stated:

Holland is procedurally barred from raising these issues because he either cites support for his contention which is different from the support he cited at the trial level or he failed to raise the issue at trial. "A trial judge cannot be put in error on a matter which was not presented to him for decision." *Pruett v. Thigpen*, 665 F. Supp. 1254, 1262 (N.D. Miss. 1986); *See Read v. State*, 430 So.2d 832, 838 (Miss. 1983)...

*Holland v. State*, 587 So.2d at 868 n.18.

¶38. The record reflects that the objections made by the defense was to the word blood being used by Officer Butler in her testimony. Officer Butler was testifying as to what she had marked on a diagram that had been marked and introduced into evidence. The following exchange transpired during Officer Butler's testimony:

A: As you can see, this is the same diagram that you looked at before, but the items on it are indicated by letters instead of numbers. On Exhibit A of the evidence we had listed the broom, which is leaning up against the sheet.

Q: Is there anything conspicuous about that broom?

A: Yes, sir. Midway up the handle there was what appeared to be a bloody smear on the broom handle.
    Defense: **Objection on the word blood**, Your Honor.

A: Appeared to be.
    State: I don't think she's testifying that it was blood. She just said it "appeared to be" or it "appeared to be bloodlike [sic]."
    Court: Overruled. She said "appeared to be."

A: Exhibit B in evidence was listed as the sheet with blood on it which would have been this curtain that was hanging and used as a door to the closet. It also had –
    Defense: Objection, again, Your Honor. **That time she said, she didn't say appeared. She said blood.**

A: I'm sorry.
    Court: Sustained as to blood.

A: Exhibit B is listed as the sheet covering the door which had what appeared to be a blood stain on it...

(emphasis added). After the exchange above, the defense did not make any further objections at trial as to Officer Butler's testimony on the grounds of use of the word blood or appeared to be blood. This assignment of error is without merit.

¶39. While this assignment of error is procedurally barred as stated above for failure to raise at trial, the defense's alternate contention on appeal is that no credible evidence existed to support that the substance could have been blood. The trial court sustained the objection as to the use of the word blood. Officer Butler testified that the substance appeared to be blood. The evidence reflects that Holliday's body was found on the floor of his apartment. He had been shot 3 times. The evidence showed that Holliday died as a result of the gunshot wound to his chest. The gunshots were made at close range. Holliday's chest had the impression the gun barrel from being shot at close range. Therefore, it is not unreasonable for Officer Butler to find that the substance appeared to be blood. This argument is without merit.

## V. Sufficient Evidence of Guilt[1]

¶40. Reynolds argues that the evidence presented was insufficient in this circumstantial case to warrant her conviction. The State contends that the record reflects that there was credible, substantial evidence to support the jury's verdict. Reynolds contends that in a circumstantial case, the State is required to prove the defendant's guilt, not beyond a reasonable doubt, but to the exclusion of every reasonable hypothesis consistent with innocence.

---

[1] The facts of this case are discussed in detail in the facts section above and will not be restated in order to avoid unnecessary repetition.

¶41.   The record reflects that the defense was granted a circumstantial jury instruction, instruction D-11.   The instruction was given to the jury to decide if the State had met its burden.   Jury instruction D-11 provides:

> The law presumes every person charged with the commission of a crime to be innocent.   This presumption places upon the State of Mississippi the burden of proving the Defendant guilty of the State of Mississippi must prove to your satisfaction, **beyond a reasonable doubt, and to the exclusion of every other reasonable hypothesis consistent with innocence**, that the Defendant is guilty.   **The presumption of innocence attends the Defendant throughout the trial and prevails at its close, unless overcome by evidence which satisfies the jury of her guilt, beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence.**   The Defendant is not required to prove her innocence.

(emphasis added).

¶42.   The jury was instructed that the State must prove Reynolds guilty to its satisfaction, beyond a reasonable doubt, and to the exclusion of every other reasonable hypothesis consistent with innocence.   The jury instruction informed the jury that it was up to them to determine if the State met its burden.   *See Dorrough v. Wilkes*, 817 So.2d 567, 574 (Miss. 2002) (when there exists a conflict in the evidence, the jury is the sole judge of the credibility of a witness and the weight of his testimony).   Therefore, this assignment of error is without merit.

¶43.   Reading the defense's brief, it appears that the defense is also attempting to make a legal sufficiency argument.   However, Reynolds's brief is written to challenge the legal sufficiency of the evidence under its argument regarding the case being circumstantial.   Regardless of the language of the brief, legal sufficiency will be briefly addressed.   Reynolds

16

was convicted of the murder of Holliday. Miss. Code Ann. § 97-3-19 sets forth the elements of murder. The statute states, in part:

> (1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
>> (a) When done with deliberate design to effect the death of the person killed, or of any human being;

¶44. On the issue of the legal sufficiency of the evidence, this Court held in *Pinkney v. State,* 538 So.2d 329, 353 (Miss. 1988), *vacated on other grounds*, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990), that reversal can only occur when evidence of one or more of the elements of the charged offense is such that "reasonable and fair minded jurors could only find the accused not guilty." (quoting *Wetz v. State,* 503 So.2d 803, 808 (Miss. 1987)). A motion for J.N.O.V. challenges the legal sufficiency of the evidence. *McClain v. State,* 625 So.2d 774, 778 (Miss. 1993). "[T]his Court properly reviews the ruling on the last occasion the challenge was made in the trial court." *Id.* at 778. Here, this occurred when the trial court denied Reynolds's motion for J.N.O.V. *See id.*

¶45. In *McClain*, 625 So.2d at 778, this Court held:

> In appeals from an overruled motion for JNOV the sufficiency of the evidence as a matter of law is viewed and tested in a light most favorable to the State. *Esparaza v. State*, 595 So.2d 418, 426 (Miss.1992); *Wetz* at 808; *Harveston v. State*, 493 So.2d 365, 370 (Miss.1986); *May v. State*, 460 So.2d 778, 780-81 (Miss.1984); *Callahan v. State*, 419 So.2d 165, 174 (Miss.1982). The credible evidence consistent with McClain's guilt must be accepted as true. *Spikes v. State*, 302 So.2d 250, 251 (Miss.1974). **The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence.** *Wetz* at 808; *Hammond v. State*, 465 So.2d 1031, 1035 (Miss.1985); May at 781.

¶46. In the case sub judice, the State proved the elements of murder. A brief review of the evidence contradicts Reynolds's claim to the contrary. In her own statement made to Investigators Butler and Nations, Reynolds placed herself at the victim's apartment. She stated that she saw no one else at the apartment when the victim was shot 3 times. She stated that she was there when the victim was shot and fell. However, she did not try to get help for the victim. She left the scene, went to a trailer and called her mother. After her mother and sister met her at the trailer and went to the scene, they returned to where Reynolds was waiting at the trailer. Reynolds's mother then called the police. When the police arrived they discovered Holliday's body. Reynolds had a scratch on her face.

¶47. Dr. Hancock, pathologist, testified that the gunshot wound to the chest and the arm were from a gunshot at close range. Dr. Hancock testified that the gunshot wound to the chest indicated that he was shot with the gun making contact with the skin. The chest area had a gun barrel impression on the skin. A gunshot residue test kit was taken from Reynolds. Whitehead, forensic scientist, testified that the gunshot residue test kit taken from Reynolds was positive for gunshot residue on her right and left palms.

¶48. The evidence clearly shows that the elements of murder were established in this case. We find that Reynolds's assignment of error is without merit.

### VI. Effective Assistance of Counsel

¶49. On appeal, Reynolds has counsel different than her trial counsel. Consequently, the issue of ineffective assistance of trial counsel is raised for the first time on her direct appeal.

¶50. "Accusations of ineffective assistance of counsel are subject to the requirements set forth under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),

and *Osborn v. State*, 695 So.2d 570, 575 (Miss. 1997). Under both cases, this Court will not find counsel's assistance ineffective unless the accused (1) cites specific instances in which the attorney was so deficient that he essentially was not acting as counsel, and (2) shows that those errors deprived the accused of a fair trial. *Id*." *Washington v. State*, 800 So.2d 1140, 1145 (Miss. 2001). The defendant bears the burden of proving a claim of ineffective assistance of counsel "to show that counsel's performance was deficient and that the deficient performance prejudiced the defense." *Leatherwood v. State*, 473 So.2d 964, 968 (Miss. 1985). "If the defendant fails to establish either component then reversal of a conviction or sentence is not warranted." *Id.*

¶51. Further, we have stated:

> The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The test is two pronged: The defendant must demonstrate that his counsel's performance was deficient, and that the deficiency prejudiced the defense of the case. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Washington v. State*, 620 So.2d 966 (Miss.1993). 'This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.' *Stringer v. State*, 454 So.2d 468, 477 (Miss.1984), citing *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064. 'In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.' *Stringer* at 477, citing *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065; *State v. Tokman*, 564 So.2d 1339, 1343 (Miss.1990).

> Judicial scrutiny of counsel's performance must be highly deferential. (citation omitted) ... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making

the evaluation, **a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance**; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' *Stringer* at 477; *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. In short, defense counsel is presumed competent. *Johnson v. State*, 476 So.2d 1195, 1204 (Miss.1985); *Washington v. State*, 620 So.2d 966 (Miss.1993).

Then, to determine the second prong of prejudice to the defense, the standard is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' *Mohr v. State*, 584 So.2d 426, 430 (Miss.1991). This means a 'probability sufficient to undermine the confidence in the outcome.' *Id*....

There is no constitutional right then to errorless counsel. *Cabello v. State*, 524 So.2d 313, 315 (Miss.1988); *Mohr v. State*, 584 So.2d 426, 430 (Miss.1991) **(right to effective counsel does not entitle defendant to have an attorney who makes no mistakes at trial; defendant just has right to have competent counsel).**

*Foster v. State*, 687 So.2d 1124, 1129-30 (Miss. 1996) (emphasis added).

¶52. Reynolds raises various alleged counsel deficiencies that she contends merit reversal on this issue. Some of the allegations involve the substance of issues already addressed in this opinion in Issues I-III. As those assignments of error that have already been addressed and determined not be reversal error, they will only be briefly reexamined here in subsection A-C.

### A. Failure to file a motion to suppress Vifran Carter from testifying

¶53. On appeal, Reynolds argues that her counsel should have filed a motion to suppress Carter's testimony. Basically, the defense remakes its argument which is contained in Issue I. As stated in Issue I, Reynolds did not suffer reversible error. The defense objected to Carter's testimony as to any conversation with Reynolds. After a lengthy examination in chambers, the State withdrew Carter as a witness. The trial court granted the request to withdraw Carter as a witness. The defense did not object. The trial court instructed the jury to disregard Carter's

testimony that she made at that point and also instructed the jury to disregard the State's remarks in its opening statement regarding Carter. We find that there was no showing of ineffective assistance of counsel to justify reversal.

### B. Opposition to a manslaughter instruction being granted

¶54. The State offered the manslaughter instruction attempting to get the trial court to grant a lesser-included instruction. Obviously, the State requested the manslaughter instruction in case the jury did not find that Reynolds met the elements of murder in order to convict on that charge. The defense objected to the manslaughter instruction. The trial court sustained the objection and did not allow the instruction. There is no adequate showing by Reynolds that the trial defense counsel's decision to oppose the manslaughter instruction was not sound trial strategy and therefore prejudiced her case. Reynolds on appeal offers no real argument as to why this amounted to ineffective assistance of counsel except to say that the jury was limited to murder, guilty or not guilty. Furthermore, the evidence presented did not warrant a manslaughter instruction as discussed in Issue II. We find this assignment of error to be without merit.

### C. Failure to object to the State closing argument statement that the police did a good job

¶55. As discussed in Issue III, the State's remarks were closely tied to the remarks made by the defense in its closing argument. The defense questioned the quality of the police work done in this case particularly that Reynolds's clothes were not tested to determine whose blood was on them. When the State made its final closing remarks, the prosecutor responded to the accusations made on close by the defense. The defense had made an earlier unrelated objection

to the State's close; however, the defense chose to not object at this point. Here, there was no showing that failure to object to the State's remark amounted to ineffective assistance of counsel to merit reversal.

### D. Failure to object to the testimony of Roosevelt Owens

¶56. Defense counsel on appeal argues that the trial counsel should have objected to Officer Roosevelt Owens, Natchez Police Department, testifying as to the statement made by Alvin Reynolds to him.[2] Officer Owens briefly testified at trial. Officer Owens testified that he was assigned to assist Investigator Nations, however, he played only a limited role in working this murder case. Officer Owens testified that he reduced his conversation with Alvin to writing.

¶57. During Officer Owens's investigation, he spoke to Alvin, Reynolds's brother. At that time, Reynolds was staying with Alvin. After the shooting took place, Reynolds came over to use the telephone and call her mother. It was somewhere around 2:40 or 2:45 a.m. The following exchange occurred:

Q:   Did you next ask, "What happened, sir? What did you hear?"
A:   Yes, sir, I did.
Q:   And what did he [Alvin] tell you?
A:   "The same thing she always tells us just about everyday. She [sic] tired of Larry messing with her and following her around and stuff."

The defense did not object. The defense did not cross-examine Officer Owens. After Officer Owens testified, the trial court recessed until the next morning. The State rested its case when the court reconvened.

¶58. Reynolds argues:

---

[2] The defense fails to discuss Alvin's testimony and that Officer Owens's testimony did not contradict Alvin's testimony that was heard by the jury.

22

The testimony may have been admissible to impeach the testimony of Alvin Reynolds. If the objection had been made the court may have allowed the testimony as impeachment testimony only. The defense may have been entitled to an instruction informing the jury that said testimony was not evidence of the truth of the matter assert [sic] but for impeachment purposes only.

¶59. Again, Reynolds does not establish that this amounted to ineffective assistance of counsel. The defense does not show that trial counsel attempted to obtain an impeachment instruction from the trial court. Officer Owens's testimony was not the only evidence presented to the jury on which Reynolds could have been convicted. Reynolds's statement placed her at the scene when Holliday was shot 3 times. She stated that she saw no one else there when Holliday was shot. The gunshot residue test kit taken from Reynolds was positive on the right and left palms. The fatal gunshot wound was shot from close, contact range. Reynolds had a scratch on her face that she stated could have been from Holliday. She left the scene and called her mother before calling the police.

¶60. Most importantly, before Officer Owens was called to testify, the State called Alvin to testify. Alvin was declared an adverse witness. Alvin testified confirming that he had told Officer Owens, "Well I heard the same thing she [Reynolds] always tells us just about everyday. She was tired of Larry messing with her and following her around and stuff. That was it." Officer Owens's testimony was not different than Alvin's testimony. There was no basis to impeach Alvin's testimony. We find this assignment of error to be without merit.

### E. Failure to determine whose shoes were at Holliday's apartment

¶61. Reynolds argues that trial counsel should have developed the size and style of a pair of shoes found at Holliday's apartment to determine if they belonged to Holliday, Reynolds or maybe someone else who could have been at the apartment when Holliday was shot. She also

23

contends that DNA testing should have been done on the shoes to determine if they might have belonged to the another person at the scene rather than Holliday or Reynolds. Reynolds's statement to the police was that she saw no one else at Holliday's apartment when the victim was shot. No witnesses testified or gave statements that they saw anyone else at the apartment when the victim was shot. The record does not support that trial counsel was deficient in failing to develop this line of investigation. We find this assignment of error does not support a claim of ineffective assistance of counsel.

## F.     Failure to reduce Reynolds's many statements to writing

¶62.    Lastly, Reynolds argues that trial counsel failed to require the State to reduce Reynolds's various statements to writing. However, the defense fails in its brief to cite to which statements Reynolds was supposed to have made that were not reduced to writing. The State does not specifically address this assignment of error in its brief. However, the State generally asserted that Reynolds does not meet her burden of establishing any ineffective assistance of counsel.

¶63.    But as previously stated, the defense fails to specify what statement were not reduced to writing. Furthermore, the defense does not claim that any of these statements contradict or conflict with each other. The burden rests upon the defendant to demonstrate how this amounts to ineffective assistance of counsel. Based on the defense's failure to do so, we find this assignment of error to be without merit. The defense has not established any deficiency in counsel's performance or any prejudice from the alleged deficient representation.

## CONCLUSION

¶64. For all the reasons stated above, this Court affirms the judgment of the Circuit Court of Adams County.

¶65. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, J., NOT PARTICIPATING.**