# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-KA-01899-SCT

*JERMAINE NEAL*

*v.*

*STATE OF MISSISSIPPI*

<table>
<tr><td>DATE OF JUDGMENT:</td><td>09/18/2007</td></tr>
<tr><td>TRIAL JUDGE:</td><td>HON. ANDREW C. BAKER</td></tr>
<tr><td>COURT FROM WHICH APPEALED:</td><td>TALLAHATCHIE COUNTY CIRCUIT COURT</td></tr>
<tr><td>ATTORNEY FOR APPELLANT:</td><td>JAMES A. WILLIAMS</td></tr>
<tr><td>ATTORNEY FOR APPELLEE:</td><td>OFFICE OF THE ATTORNEY GENERAL BY: LADONNA C. HOLLAND</td></tr>
<tr><td>DISTRICT ATTORNEY:</td><td>JOHN W. CHAMPION</td></tr>
<tr><td>NATURE OF THE CASE:</td><td>CRIMINAL - FELONY</td></tr>
<tr><td>DISPOSITION:</td><td>AFFIRMED - 06/04/2009</td></tr>
<tr><td>MOTION FOR REHEARING FILED:</td><td></td></tr>
<tr><td>MANDATE ISSUED:</td><td></td></tr>
</table>

**EN BANC.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.    Jermaine Neal was convicted of the murder of his girlfriend, Lakeshia Cleveland. The Circuit Court of Tallahatchie County sentenced Neal to life in the custody of the Mississippi Department of Corrections. Neal appeals. He makes the following ten assignments of error for our determination:

> I. Whether the jury instructions failed to track the material elements of the indictment.

> II. Whether the voir dire process prejudiced the jury against Neal and denied him a fair trial.

III. Whether Neal was entitled to a change of venue.

IV. Whether the trial court erred in not conducting an examination of a juror who left the courtroom without permission.

V. Whether hearsay testimony denied Neal his right to confrontation.

VI. Whether Neal received ineffective assistance of counsel.

VII. Whether there was a valid conviction despite the trial court's failure to state that the court accepted the jury's verdict.

VIII. Whether Neal was entitled to lesser-offense jury instructions on the crimes of heat-of-passion manslaughter and desecration of a human corpse.

IX. Whether cumulative error requires reversal.

X. Whether the evidence was sufficient to support the verdict and whether the verdict was against the overwhelming weight of the evidence.

## FACTS

¶2.     On August 21, 2006, Jermaine Neal and Lakeshia Cleveland were living together in Scobey, Mississippi. Two of Cleveland's children also lived in the home at this time: A.B., who was approximately eight months old, and C.D., age nine.[1] A.B. supposedly was Neal's son, but Neal recently had become suspicious of whether he really was A.B.'s father. C.D. had a different biological father. On this particular day, Mary Loerker, the couple's neighbor, picked up C.D. from the bus stop after school. When C.D. attempted to get into his house, the windows and doors were locked, which, according to C.D., was abnormal. C.D. went to Loerker's residence and eventually fell asleep.

---

[1] The children's names have been changed to protect their identities.

2

¶3.     Shortly after 1 a.m. on the morning of August 22, 2006, Neal began pounding on Loerker's door, claiming that "his baby" was dead. Loerker called the police. Tallahatchie County Sheriff's Deputy Rodzinsky Weekly responded to the dispatch. Upon Deputy Weekly's arrival, Neal approached Weekly's car carrying A.B. He informed Deputy Weekly that the baby's mother was dead in their house. At this point, Deputy Weekly handcuffed Neal and placed him in his patrol car. Deputy Weekly entered the home. He witnessed a large amount of blood on the master bed, a blood trail leading from the master bedroom to the bathroom, and Cleveland's decapitated, naked body floating in the bathtub. Deputy Weekly contacted Sheriff William Brewer and Investigator Brandon Hodges.

¶4.     Investigator Hodges testified that when he arrived on the scene, he entered the home and noticed the blood-stained bed, the blood trail to the bathroom, a blue comforter in the bathroom, and a bottle of bleach near the bathtub. He observed that someone had written the words, "Bitch take care of my son" and "Lame" in marker on the bathroom wall. Investigator Hodges requested assistance from Investigator Walter Davis of the Mississippi Bureau of Investigation. When Investigator Davis arrived, Hodges and Davis got into the back seat of the patrol car with Neal, read Neal his *Miranda* rights, obtained Neal's waiver of his rights, and received Neal's written consent to search the residence. *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶5.     The officers questioned Neal in the patrol car for about twenty minutes. Neal communicated that he had worked the three-to-eleven p.m. shift that night. He said that when he returned home, he found Cleveland's body in its present condition, with the baby still in

3

his crib just as Neal had left him before going to work. After the interview, Sheriff Brewer transported Neal to the police department for further questioning; the Mississippi Department of Human Services was contacted to retrieve the two children. Officers subsequently obtained Neal's clock-in sheet from work, which indicated that Neal had clocked in ten minutes late on the date the murder occurred. Neal's supervisor indicated that this was highly unusual, because Neal was always at work early.

¶6. At the jail, Neal gave his permission for officers to collect his clothing, fingernail clippings, and a DNA swab. Investigator Hodges noticed that while Neal had no blood on his outer clothing, there was a blood stain on his underwear. That afternoon, officers again gave Neal his *Miranda* rights, obtained Neal's waiver of his rights, and questioned him. *See id.* At first, Neal was adamant that he was not involved in the murder. However, later that day, he told the officers that if they would let him use a pay phone, he would tell them where he put Cleveland's head. After using the pay phone, Neal informed the officers that he had disposed of Cleveland's head in Grenada Lake; he agreed to show them the exact location.

¶7. Despite Neal's indication that he would cooperate with the investigation, he proved to be evasive about the location of Cleveland's head, and it was never found. Initially, officers transported Neal to a dam at Grenada Lake where Neal said he had thrown Cleveland's head in the water. But when the investigators told Neal that it would have been impossible for him to have thrown the head that far, Neal changed his story and said that he threw it off the main spillway. After failing to locate Cleveland's head near the spillway, investigators obtained

4

video surveillance tapes of the spillway from the time in question. The tapes did not show that Neal had been there.

¶8. On the ride back to the sheriff's department from the spillway, Investigator Davis questioned Neal further and took notes. Investigator Davis asked Neal why Cleveland did not struggle while she was being decapitated. In response, Neal asked to see the pad on which Investigator Davis had been writing. Neal wrote on the pad that he had shot Cleveland twice in the head before decapitating her.

¶9. The next afternoon, Investigators Davis and Hodges again gave Neal his *Miranda* rights, obtained Neal's waiver of his rights, and performed another interview, which was videotaped. *See id.* During this interview, Neal told the officers that he and Cleveland had gone to Batesville that morning. When they returned home, they lay down for a nap. Neal said that while Cleveland was asleep, he shot her twice, then he retrieved a knife from the kitchen and cut off her head. Neal said that he put Cleveland's decapitated body inside a comforter, dragged it to the bathroom, filled the bathtub with water, put Cleveland's body into the bathtub, and poured bleach on it to remove his fingerprints. Neal stated that he retrieved Cleveland's head from the bed and placed it into a bag along with the knife. It was at that point that he wrote on the bathroom wall. Then Neal departed; he threw the bag containing Cleveland's head into Grenada Lake, disposed of the gun at a construction site, and continued on to his job.

¶10. When asked what prompted him to murder Cleveland, Neal responded that "it was just a lot of pressure." Neal stated that although he and Cleveland had not been arguing on the day

of the murder, he had begun to suspect that Cleveland was being unfaithful and that the baby, A.B., was not his son. Neal confessed that he had attempted to conceal his guilt of the murder by sending text messages from Cleveland's cell phone to Cleveland's friend's cell phone and from his own cell phone to Cleveland's cell phone. Subsequently, the police searched for the items Neal disposed of, including dragging the spillway and employing a dive team. But despite searching every location Neal identified, neither Cleveland's head, the knife, nor the gun were ever recovered. No shell casings were located at the crime scene.

## ANALYSIS

### I. WHETHER THE JURY INSTRUCTIONS FAILED TO ADDRESS EVERY MATERIAL ELEMENT IN THE INDICTMENT.

¶11. Neal claims that a jury instruction on murder constructively amended the indictment. Neal was charged and convicted under Mississippi Code Section 97-3-19(1)(a), which states that the killing of a human being will be considered murder "[w]hen done with deliberate design to effect the death of the person killed, or of any human being." Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2006). Neal's indictment charged that Neal "on or about the 22nd day of August . . . 2006 . . . did willfully, unlawfully, and feloniously decapitate Lakeshia Cleveland, a human being; Jermaine Neal acted with the deliberate design to effect the death

6

of Lakeshia Cleveland, in direct violation of Section 97-3-19(1)(a)."[2] [3]  The jury was instructed that it could find Neal guilty of murder if it found beyond a reasonable doubt that Neal had killed Cleveland with the deliberate design to effect her death, and not in necessary self-defense.  Thus, the murder instruction allowed the jury to return a verdict of guilt if it believed that Neal had killed Cleveland in some manner other than by decapitation.

¶12.    Neal also argues that the State's evidence showed that he killed Cleveland by shooting her in the head; therefore, the evidence was insufficient to enable a rational jury to find beyond a reasonable doubt that he had killed Cleveland by decapitation as charged in the indictment.  In support of this contention, Neal avers that the report of Cleveland's autopsy, which was not requested to be admitted into evidence by either party, states that Cleveland's decapitation was post-mortem.  Essentially, Neal contends that the murder instruction should have been redrafted to require a jury finding that he had killed Cleveland by decapitation, and that if the redrafting had been accomplished, the evidence would have entitled him to a directed verdict of acquittal.

---

[2] Because decapitation is a certainly deadly act when done with deliberate design to effect the death of a human being, the indictment adequately alleged that Neal had killed Cleveland.  Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2006).

[3] We note that in an indictment for homicide, "it shall not be necessary to set forth the manner in which or the means by which the death of the deceased was caused, but it shall be sufficient to charge in an indictment for murder, that the defendant did feloniously, willfully, and of his malice aforethought, kill and murder the deceased."  Miss. Code Ann. § 99-7-37 (Rev. 2007).

¶13. We find that this issue is procedurally barred; alternatively, we find that the murder instruction was not fatally defective for permitting the jury to find that Neal had killed Cleveland by any method. "This Court has held on numerous occasions that an offended party's failure to object to jury instructions at trial procedurally bars the issue on appeal." *Smith v. State*, 835 So. 2d 927, 939 (Miss. 2002) (citing *Walker v. State*, 729 So. 2d 197, 202 (Miss. 1998)). Neal did not object contemporaneously to the granting of the jury instruction, and he raises this issue for the first time on appeal. Neal's indictment alleged every essential element of murder; his failure to object to the jury instruction as constructively amending the indictment waives this issue on appeal. *Rubenstein v. State*, 941 So. 2d 735, 774 (Miss. 2006); *see McDowell v. State*, 984 So. 2d 1003, 1012-1013 (Miss. Ct. App. 2007).

¶14. Notwithstanding the procedural bar, this issue is without merit. "The major purpose of an indictment is to furnish the accused such a description of the charges against him as will enable him to adequately prepare his defense." *Williams v. State*, 445 So. 2d 798, 804 (Miss. 1984) (internal citations omitted). "[A]s a general rule, an indictment which tracks the language of a criminal statute is sufficient to inform the defendant of the charge against him." *Jordan v. State*, 995 So. 2d 94, 109 (Miss. 2008) (quoting *Stevens v. State*, 808 So. 2d 908, 919 (Miss. 2002)). In contrast, the main "purpose of jury instructions is to tell the jury what facts they have to find and who has the burden of proving or disproving those facts." *Harris v. State*, 861 So. 2d 1003, 1016 (Miss. 2003).

¶15. In *Duplantis v. State*, 708 So. 2d 1327, 1343 (Miss. 1998), Duplantis was indicted for felony murder while engaged in the commission of a robbery under Mississippi Code Section

8

97-3-19(2)(3). Duplantis's indictment charged that he had killed the victim with malice aforethought. *Duplantis*, 708 So. 2d at 1343. However, the felony-murder statute under which Duplantis was indicted prescribes that the killing have been done "with or without any design to effect the death." Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2006). Two jury instructions tracked the language of the felony-murder statute, thus permitting the jury to find Duplantis guilty without a finding that he had killed with malice aforethought. *Duplantis*, 708 So. 2d at 1343. On appeal, Duplantis argued that the jury instructions "constructively and unconstitutionally amended the indictment because they broaden[ed] the elements of the offense, thereby allowing him to be convicted on a ground not alleged by the grand jury. " *Id.*

¶16. This Court rejected Duplantis's argument. *Id.* at 1344. We stated that it was permissible to allege deliberate design in a felony-murder indictment and that jury instructions should track the indictment. *Id.* at 1343-44. However, because intent to kill is not an element of felony murder in the course of a robbery, we held that the jury instruction omitting the indictment's intent-to-kill language was not fatally defective. *Id.* at 1344. We stated, "[a]lthough the instructions may not accurately follow the indictment, they do accurately follow the requisite elements of the crime." *Id.*

¶17. As in *Duplantis*, the murder instruction at issue in this appeal was not fatally defective. Neal's indictment charged that Neal had decapitated Cleveland with deliberate design to effect her death and in violation of section 97-3-19(1)(a). Although the murder instruction did not restrict the jury to a finding that Neal had killed Cleveland by the method alleged in the

9

indictment, it accurately followed the requisite elements of murder prescribed by Section 97-3-19(1)(a). Therefore, the murder instruction was not fatally defective. **Duplantis**, 708 So. 2d at 1344. This issue is without merit.

## II. WHETHER THE VOIR DIRE PROCESS PREJUDICED THE JURY AGAINST NEAL AND DENIED HIM A FAIR JURY TRIAL.

¶18. Neal argues that three errors occurred during the voir dire process that denied him the right to a fair and impartial jury.

*A. Whether Neal was prejudiced by "implicit communication" from the trial court to the venire.*

¶19. The trial court asked the members of the venire to indicate if they had had any type of contact or relationship with Neal that would preclude them from being fair-minded jurors. Nine venire persons indicated that they could not be fair and impartial. The trial court informed each of the nine that he or she would not be required to answer any further questions. After voir dire, all nine were excluded from the jury. Neal argues that the judge's instruction of each of the nine venire persons not to answer any further questions "communicated implicitly to the other panel members if they wanted to stay on the jury, they should be cautious in giving any response that might indicate pre-judgment."

¶20. The trial judge has a duty to ensure "that a competent, fair and impartial jury is empaneled." **Tighe v. Crosthwait**, 665 So. 2d 1337, 1339 (Miss. 1995). Mississippi Code Section 13-5-79 states that a juror "shall be excluded . . . if the court be of the opinion that he cannot try the case impartially, and the exclusion shall not be assignable for error." Miss. Code Ann. § 13-5-79 (Rev. 2002). This Court will presume that the voir dire process used

10

at trial was "sufficient to ensure a fair and impartial jury." ***Ross v. State***, 954 So. 2d 968, 988 (Miss. 2007). A defendant must "present evidence indicating that the jury was not fair and impartial and show that prejudice resulted from the circuit court's handling of the voir dire" in order to rebut that presumption. ***Id***. (citing ***Manning v. State***, 735 So. 2d 323, 336 (Miss. 1999)). "A trial court's determination that the jury is impartial will not be overturned by this Court absent an abuse of discretion. This Court will treat with deference a venire person's assertions of impartiality." ***Id***. (citing ***Holland v. State***, 705 So. 2d 307, 336 (Miss. 1997)).

¶21. Because Neal did not object to the trial court's statement during the voir dire process, this issue is procedurally barred. *See* ***Moody v. State***, 841 So. 2d 1067, 1075 (Miss. 2003). Alternatively, this issue is without merit. Neal cites no authority for his proposition that the trial judge's actions were inappropriate, nor does he cite any evidence in the record that indicates the jury was prejudiced against him. Indeed, the record evinces that the trial court appropriately struck all nine venire persons due to their explicit inability to function as impartial members of the jury.

> B. *Whether Juror Ardis Lee Jones should have been excused from the jury because of his poor eyesight.*

¶22. After the oath was administered to the jurors but before the trial began, Juror Ardis Lee Jones informed the judge that his eyesight was poor and that it had affected his ability to read. The following exchange occurred:

> The Court: Gentleman, I don't know what to do but to substitute an alternate juror. I asked the whole panel this morning if they could read or write. I didn't ask any of them if they couldn't see well enough to read.

Mr. Barnett [counsel for Neal]: Of course, Your Honor, the instructions are going to be read to him.

The Court: They will be.

Mr. Barnett: By the Court, and I don't know what else he might need to read that may come into evidence but I believe he said – can you see me?

Juror Ardis Lee Jones: Yes sir, I have real bad eyesight.

Mr. Barnett: I hope that he might could –

The Court: Let's just kind of see how the evidence flows. I don't know what the evidence is going to be other than the instructions of law.

Mr. Champion [prosecuting attorney]: Your honor, we are going to have some photographs. We are going to have two videotapes that are pretty important. I don't know if he'll be able to – the juror can answer if whether or not he can see well enough.

The Court: Let's start it out this way. Let's let him try and I am going to ask you at some point in time if you are seeing everything that you need to see like these videos. We have got two alternate jurors. You know, if you can't see, we'll – I'll excuse you.

¶23. After the photographic evidence had been presented, the trial judge asked Juror Jones if he could see the photographs. Juror Jones answered in the affirmative. Immediately before giving the jury instructions, the trial judge again asked Juror Jones if he had been able to fully see all evidence presented throughout the trial. Juror Jones indicated that he had been able to see it.

¶24. Neal argues that he was prejudiced by the inclusion of Juror Jones on the jury, reasoning that "once the juror is into the evidence, including hearing the video confession . . . he will say he had no trouble seeing." However, the excerpt of the transcript above shows

12

that Neal's attorney did not request the substitution of an alternate juror or object in any way to Juror Jones's presence on the jury. Because Neal did not object, this issue is procedurally barred. *See Moody,* 841 So. 2d at 1075. Alternatively, we note that nothing in the record substantiates Neal's wholly speculative argument that Juror Jones misrepresented his visual abilities to the trial court.

> *C. Whether during voir dire the parties were allowed to define reasonable doubt, and whether a juror was found to be confused, yet was not stricken.*

¶25.    Next, Neal claims that comments by the prosecutor and by his own counsel improperly defined reasonable doubt, and that the trial court should have stricken Juror Norris Dungan, who was confused by these comments.[4] Neal takes issue with the following comments by the State:

> Q:  Now, in Mississippi, we do not give definitions of reasonable doubt and what I like to tell people, reasonable doubt is what you hear from the evidence, what law is given to you by Judge Baker, and your common sense. You take those three things and you put them all together and you can reach a decision on a case. Okay? That's what I define reasonable doubt as. But Judge Baker is not going to tell you this is the law in Mississippi on reasonable doubt. It is something that you, each, individually, must decide on your own.
>
> There are some people that say, "Mr. Champion, I want to make you prove your case beyond all doubt." Is there anybody in here that's going to make me do that because if you do, you are holding me to a higher standard than the law requires. Beyond a reasonable doubt is the legal standard. Is there anybody that's going to make me prove my case beyond all doubt?

---

[4]Juror Dungan began the trial as an alternate juror, but later was substituted for a juror who was excused because of her emotional reaction to this case.

13

Juror Dungan indicated that he would hold the State to a "beyond-all-doubt" standard. When another venire person asked what reasonable doubt was, the prosecutor stated:

> What is my definition? My definition really doesn't matter unfortunately. I bet mine and Mr. Barnett's definition is different. It is just something that you have got to decide in your own mind once you hear the evidence. And I wish I can – I sometimes hesitate about asking this question because typically somebody is going to ask me what is the definition of beyond a reasonable doubt as opposed to beyond all doubt and I really can't give it to you. I always like to say, well, when you are finally convinced one way or the other is the best way I can describe it.

Defense counsel told the jury pool that "I've always thought a reasonable doubt, the word 'reasonable' is reasonable. It is able to be arrived at through reason. That is a doubt that is able to be arrived at through reasoning."

¶26.    Neal references the following exchange as evidence that the trial court recognized that Juror Dungan was confused about the reasonable-doubt standard, yet refused to strike him for cause:

> The Court: I marked on No. 185 [Dungan] about all your doubt and reasonable doubt, John [Champion]. I never know when the juror really understands the fine lines that a lawyer does. Are you going to ask that he be dismissed?
>
> Mr. Champion: Probably not. To be honest with you, if I need to get rid of him, I'll use one of my strikes.
>
> The Court: Because I was going to give Mr. Barnett a chance to rehabilitate him if you were going to strike him because oftentimes I think a juror gets confused on that reasonable doubt.
>
> Mr. Barnett: I thought John would allow him to stay on the jury just so it would be even, you know. Just sportsmanship, you know. I mean, during the trial, John could try to rehabilitate him.

14

¶27. Neal's failure to object to the prosecutor's comments during voir dire renders this issue procedurally barred. *King v. State*, 615 So. 2d 1202, 1205 (Miss. 1993). Alternatively, this issue is without merit. This Court repeatedly has held that the general discussion of the concept of reasonable doubt by counsel during voir dire is not objectionable. *See Kennedy v. State*, 766 So. 2d 64, 65 (Miss. Ct. App. 2000) (citing *Thorne v. State*, 348 So. 2d 1011, 1013-15 (Miss. 1977)). Furthermore, this Court has found similar comments to those at issue in this case "to be unobjectionable so long as reasonable doubt is not defined when the trial court instructs the jury." *Simon v. State*, 857 So. 2d 668, 696 (Miss. 2003). The jury instructions in this case properly omitted any definition of reasonable doubt. There is no indication that the presence of Juror Dungan prejudiced Neal; in fact, it appears that Neal's counsel favored Juror Dungan's presence on the jury. Nor does it appear from the record that Neal's jury was anything but the impartial and fair jury that this Court presumes was produced by the voir dire process.

### III. WHETHER THE TRIAL COURT ERRED BY FAILING TO CHANGE THE VENUE OF THE TRIAL.

¶28. Neal contends that he was "denied a fair trial because the judge and the jury pool all knew sufficient information about the highly publicized and naturally attention-grabbing decapitation murder." He argues that he was entitled to a change of venue. As the State points out, Neal never moved for a change of venue, nor did he even minimally comply with the statutory requirements. "[A]n application for change of venue must conform strictly to the statute." *Baldwin v. State*, 732 So. 2d 236, 241 (Miss. 1999). The governing statute,

Mississippi Code Section 99-15-35, requires that the prisoner make a sworn, written application supported by the affidavits of at least two credible persons attesting to the fact that the prisoner will be unable to receive a fair and impartial trial in the county where the offense is charged because of pretrial publicity or ill will toward the defendant by the general public. Miss. Code Ann. § 99-15-35 (Rev. 2007). "[T]he defendant is required to make some showing by testimony of local citizens that he cannot receive a fair trial in the community." *Irving v. State*, 498 So. 2d 305, 320 (Miss. 1986). Because Neal never applied for a change of venue in the trial court, he is procedurally barred from raising this argument on appeal. *Wilson v. State*, 797 So. 2d 277, 284 (Miss. Ct. App. 2001).

### IV. WHETHER THE TRIAL COURT ERRED IN NOT CONDUCTING AN EXAMINATION FOR IMPROPER INFLUENCE WHEN A JUROR LEFT THE COURTROOM WITHOUT PERMISSION.

¶29. During the State's examination of Investigator Davis, a juror left the courtroom without permission. The following excerpt is the only mention of the incident found in the record:

A: [by Davis, in response to a question from the State] Yes, sir, that's the right form.

(Juror left courtroom).

Bailiff: She didn't hold her hand up, Judge.

The Court: Go look for her and see what's wrong.

(Brief recess).

By Mr. Champion: (continuing)

The State then continued its examination of Davis. Neal did not object or request a hearing to ascertain whether or not the juror had been improperly influenced. On appeal, Neal argues that the trial judge erred by failing to inquire whether the juror had been subjected to some inappropriate pressure while outside of the bailiff's control.

¶30. "This Court . . . 'presumes that jurors follow the instructions of the court. To presume otherwise would be to render the jury system inoperable.'" ***Moore v. State***, 787 So. 2d 1282, 1291 (Miss. 2001) (quoting ***Puckett v. State***, 737 So. 2d 322, 347 (Miss. 1999)). Uniform Circuit and County Court Rule 3.06 makes clear that: "[j]urors are not permitted to mix and mingle with the attorneys, parties, witnesses and spectators in the courtroom, corridors, or restrooms in the courthouse. The court must instruct jurors that they are to avoid all contacts with the attorneys, parties, witnesses or spectators." Accordingly, after the jury was sworn, the trial court informed them:

> Should anyone approach you, don't engage in conversation with anyone. You are required to make your decision based on the evidence presented here in the courtroom and instructions of law that I give to you to follow. Anything else would be improper. If you are talking to people around the hall ways [sic], on the elevator, parking lot, somebody's going to report that to me and I'm going to have to recess a trial and bring you in and conduct a hearing and try to determine if anybody, No. 1, has done anything improper and if so, has it affected someone's right. So, if you just kind of hang by yourself for the next day or so, it will be the best way to handle that. For instance, we are going to recess for lunch in a few minutes and you'll be on your own.

There is nothing in the record to overcome the presumption that the juror followed the trial court's instructions not to talk to anyone. Moreover, it appears that the bailiff promptly followed the juror from the courtroom; presumably, if the bailiff had seen the juror

17

communicating with someone outside the courtroom, he would have informed the trial judge, who then would have conducted a hearing on the matter. Neal did not request a hearing, nor did he request that a record be made on anything that transpired during the recess concerning the juror. This issue is without merit.

## V. WHETHER HEARSAY TESTIMONY DENIED NEAL HIS RIGHT TO CONFRONTATION.

¶31.    Neal asserts that the State elicited impermissible hearsay testimony twice during its case-in-chief. First, Neal's neighbor, Loerker, testified that when Cleveland's son, C.D., came back to her house, he complained to her that "his bedroom window was locked and he could hear his baby brother crying inside but nobody would answer the door or let him in and he said, 'that seems odd. My window is never locked.'" Second, Detective Hodges testified that he believed the eight-month-old had been in his crib since around three o'clock p.m. because C.D. had been to the home, had heard the baby crying, and had returned to Loerker's home.

¶32.    Neal claims that his Sixth Amendment right to confront the witnesses against him was violated by the admission of these two statements in violation of *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). As Neal did not contemporaneously object to the admission of either of these statements, he failed to preserve this issue for appeal. *Boyd v. State*, 977 So. 2d 329, 337 (Miss. 2008). However, "[u]nder the plain-error doctrine, we can recognize obvious error which was not properly raised by the defendant on appeal, and which affects a defendant's 'fundamental, substantive right.'" *Smith v. State*, 986 So. 2d 290, 294 (Miss. 2008). This Court has held that a violation of the Confrontation Clause is a

18

violation of a "fundamental, substantive right." *Id.* To show plain error, Neal must prove that the inclusion of the statements "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776, 123 L. Ed. 2d 508, 518 (1993). "To determine if plain error has occurred, we must determine 'if the trial court has deviated from a legal rule, whether that error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial.'" *McGee v. State*, 953 So. 2d 211, 215 (Miss. 2007).

¶33.    Hearsay is defined as "a statement . . . offered in evidence to prove the truth of the matter asserted." Miss. R. Evid. 801(c). Loerker's testimony about what C.D. said was indeed hearsay because it was offered to prove the truth of the matter asserted, which was that at the time C.D. arrived home, he could not get inside because no one answered the door, and his window, although ordinarily open, was locked. Miss. R. Evid. 801(c). These facts supported the prosecution's theory that Neal killed Cleveland and then altered the crime scene and locked the windows before he went to work; the prosecutor referenced these facts in closing argument in support of this theory.

¶34.    However, Loerker's hearsay testimony did not violate Neal's Sixth Amendment right, because only testimonial hearsay is capable of violating the Sixth Amendment. *Crawford*, 541 U.S. at 68. While the Court in *Crawford* declined to provide a "comprehensive definition of 'testimonial,'" it stated that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations, . . . the modern practices with closest kinship to the abuses at which the

19

Confrontation Clause was directed." *Id.* In the Court's analysis, it articulated that "'[t]estimony,'. . . is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 541 U.S. at 51 (citation omitted). The Court further stated that:

> Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalent that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,". . . "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Id.* at 51-52 (citations omitted).

¶35. Applying *Crawford*, this Court has held that "a statement is testimonial when it is given to the police or individuals working in connection with the police for the purpose of prosecuting the accused." *Hobgood v. State*, 926 So. 2d 847, 852 (Miss. 2006). C.D.'s statements to Loerker were not made for any prosecutorial purpose; in fact, neither C.D. nor Loerker even knew of Cleveland's death at the time the statement was made. Loerker's testimony about C.D.'s comments bore no resemblance to the core class of testimonial hearsay identified in *Crawford*. Therefore, we find that it was nontestimonial, and it did not implicate Neal's Sixth Amendment right or the plain-error doctrine.

20

¶36. Nor was the plain-error doctrine implicated by Investigator Hodges's testimony. That testimony was not hearsay, and thus a hearsay objection to the testimony properly would have been overruled. Investigator Hodges's testimony was responsive to questions from the State as to why he contacted the Department of Human Services to pick up the children from the scene. Investigator Hodges responded that he did so because the mother was dead, the father was with police, and the baby had been left in the crib for an extended period of time. He explained that he had concluded that the baby had been in his crib since the afternoon based on the information provided to him by Loerker that C.D. had heard the baby crying that afternoon. Investigator Hodges's testimony was not elicited to prove that the baby in fact had been crying that afternoon, but only to explain Investigator Hodges's decision to proceed as he did regarding the children. Thus, this testimony was not offered to prove the truth of the matter asserted, and it is not considered hearsay. *Rubenstein*, 941 So. 2d at 764; *Neal v. State*, 805 So. 2d 520, 523 (Miss. 2002).

## VI. WHETHER NEAL RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

¶37. With new appellate counsel, Neal lists eight allegations of ineffective assistance by his trial counsel. We quote this list, verbatim:

1. [defense counsel] promised in opening intruders had killed Lakeshia and threatened Neal if he told investigators, but never again touched on this subject at all;

2. failed to object to *Crawford v. Washington* hearsay used to develop motive and culpability;

21

3. failed to cross-examine witnesses on the crime scene to develop support for post-mortem decapitation and use autopsy concluding such;

4. failed to object to jury instruction that did not include decapitation and cause of death;

5. failed to move for a change of venue;

6. failed to call Neal to testify in support of intruder defense;

7. failed to make timely objections and demand adverse rulings from the court;

8. failed to request lesser included manslaughter and mutilation instructions.

¶38.   The State argues that Neal's ineffective-assistance-of-counsel claim cannot be raised on direct appeal because the claims are incapable of showing deficient performance based upon the "four corners of the record." *McGregory v. State*, 979 So. 2d 12, 21 (Miss. Ct. App. 2008).   Mississippi Rule of Appellate Procedure 22(b) states that "[i]ssues which may be raised in post-conviction proceedings may also be raised on direct appeal if such issues are based on facts fully apparent from the record."  But if "the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceedings." *Id*.

¶39.   The comment more fully explains that:

Rule 22(b) allows the appellant to raise post-conviction issues on direct appeal where the issues are fully apparent from the record of the trial, and failure to raise such issues constitutes a waiver. Under this provision, issues such as claims of ineffective assistance of counsel for failure to object to evidence offered by the state or to argument by the state must be raised on direct appeal. Other post-conviction issues which cannot be raised at the time of appeal

22

because they involve actions or inaction outside the record are not waived since they cannot practically be raised without further development or investigation.

Miss. R. App. P. 22 cmt.; *see also Havard v. State*, 928 So. 2d 771, 782-84 (Miss. 2006).

¶40. This Court also has detailed the appropriate standards of review and tests for determining whether a defendant has received ineffective assistance of counsel:

> a defendant must prove that his attorney's performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-696, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *Wilcher v. State*, 479 So. 2d 710, 713 (Miss. 1985); *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984). This Court looks at the totality of circumstances to determine whether counsel's efforts were both deficient and prejudicial. *Carney v. State*, 525 So. 2d 776, 780 (Miss. 1988); *Read v. State*, 430 So. 2d 832, 839 (Miss. 1983). "Judicial scrutiny of counsel's performance [is] highly deferential." *Strickland*, 466 U.S. at 689. There is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Carney*, 525 So. 2d at 780; *Gilliard v. State*, 462 So. 2d 710, 714 (Miss. 1985). Only where it is reasonably probable that but for the attorney's errors, the outcome of the trial would have been different, will we find that counsel's performance was deficient. *Dickey v. State*, 662 So. 2d 1106, 1109 (Miss. 1995); *Reed v. State*, 536 So. 2d 1336, 1339 (Miss. 1988).

*Holly v. State*, 716 So. 2d 979, 989 (Miss. 1998).

¶41. Neal's first argument is that his trial counsel provided the framework of a defense theory during his opening statement, but he never mentioned that theory again. It is true that during his opening statement, defense counsel explained how armed intruders entered the home, held Neal at gunpoint, and then shot and decapitated Cleveland. He told the jury that Neal initially had told this same story to investigators. This initial theory of defense was not explored by the defense during cross-examination of the State's witnesses or during Neal's case-in-chief.

23

¶42. Just because certain "issues may properly be raised on direct appeal, . . . we still must make a determination as to whether certain issues should be addressed on direct appeal, or be left for another day for post-conviction relief proceedings." *Havard*, 928 So. 2d at 784. The specific issue here is whether or not defense counsel's failure to address the intruder theory during Neal's case-in-chief constituted ineffective assistance. There is no way to definitely analyze this question without information outside the record. There could be several reasonable explanations for why defense counsel never revisited the intruder theory, including the fact that Neal did not take the stand. Because this issue involves questions of inaction by trial counsel and would require information outside the record, it cannot properly be addressed at this time. It more appropriately would be raised in post-conviction-relief proceedings.

¶43. As for the remaining seven assertions made by Neal in support of his claim of ineffective assistance of counsel, none constitutes ineffective assistance. Neal's assertions that defense counsel failed to object to hearsay and jury instructions and failed to make timely objections are all protected as within the realm of trial strategy. "The decision to 'make certain objections fall[s] within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim.'" *Spicer v. State*, 973 So. 2d 184, 203 (Miss. 2007) (quoting *Powell v. State*, 806 So. 2d 1069, 1077 (Miss. 2001)). Likewise, Neal's claim that defense counsel failed to cross-examine witnesses to develop a post-mortem-decapitation theory falls within the ambit of trial strategy. *See Wilcher*, 863 So. 2d at 762. Neal's allegation that defense counsel was deficient for failing to move for a change of venue does not require reversal. "This Court has held that defense counsel is under no duty to attempt to

24

transfer venue; therefore, the decision not to seek a change of venue would fall within the realm of trial strategy." *Brawner v. State*, 947 So. 2d 254, 262 (Miss. 2006). Neal's claim that it was error for counsel not to request the lesser-offense manslaughter and mutilation jury instructions fails, as this Court has stated that "trial counsel's decision to not request a jury instruction falls under the category of trial tactics, which are not subject to review." *Smiley v. State*, 815 So. 2d 1140, 1148 (Miss. 2002)

¶44. Finally, the fact that defense counsel never called Neal to testify in support of an intruder defense does not constitute ineffective assistance of counsel. The trial judge questioned Neal in chambers about whether or not he wanted to testify. Neal and his defense counsel spoke privately about the matter, and Neal determined that he wished to remain silent. The record also indicates that defense counsel discussed the possibility of testifying versus not testifying with Neal on several occasions, and Neal felt that it was in his best interest not to testify. Neal agreed with these statements while in chambers. Defense counsel cannot be held in error for failing to call a defendant to testify when the defendant makes an informed and voluntary decision to remain silent. *Gray v. State*, 887 So. 2d 158, 168 (Miss. 2004). None of Neal's contentions requires reversal based upon ineffective assistance of counsel.

### VII. WHETHER THE TRIAL COURT VALIDLY ACCEPTED THE JURY'S VERDICT AND ADJUDICATED NEAL GUILTY.

¶45. Neal argues that the trial judge never properly accepted the jury verdict and adjudicated him guilty on the record; therefore, no valid conviction exists. He cites Mississippi Code Section 99-19-3(1), which provides, in pertinent part, that: "a person indicted for a criminal

25

offense shall not be convicted thereof unless . . . by verdict of a jury accepted and recorded in court.  A person shall not be punished therefor unless legally convicted."  Miss. Code Ann. § 99-19-3(1) (Rev. 2007).  Neal contends that under Section 99-19-3(1), no valid conviction exists because the trial judge did not expressly state on the record that "the court accepts the jury's verdict."

¶46.    Uniform Circuit and County Court Rule 3.10 governs jury deliberations and verdicts. The rule states, in part, that:

> When the jurors have agreed upon a verdict they shall be conducted into the courtroom by the officer having them in charge.  The court shall ask the foreman or the jury panel if an agreement has been reached on a verdict.  If the foreman or the jury panel answers in the affirmative, the judge shall call upon the foreman or any member of the panel to deliver the verdict in writing to the clerk or the court.  The court may then examine the verdict and correct it as to matters of form.  The clerk or the court shall then read the verdict in open court in the presence of the jury.  The court shall inquire if either party desires to poll the jury, or the court may on its own motion poll the jury. . . . If the court, on its own motion, or on motion of either party, polls the jury, each juror shall be asked by the court if the verdict rendered is that juror's verdict. In a criminal case where the verdict is unanimous . . . the court shall order the verdict filed and entered of record and discharge the jury unless a bifurcated hearing is necessary.

¶47.    The record of the proceedings in the instant case indicates the procedures prescribed in Rule 3.10 were scrupulously followed.  The trial court received a note from the jury stating that it had reached a verdict, and the court ordered that the jury return to the courtroom.  When the jury was seated, the trial court asked one juror if the jury had reached a decision in this case, and if that decision was unanimous.  The juror responded affirmatively to both questions.  The trial court asked the court clerk to read the jury's written verdict aloud in open

26

court. The court clerk read the verdict, which stated: "We, the jury, find the defendant, Jermaine Neal, guilty as charged." The trial court asked if counsel had any requests, and Neal's counsel responded that he would like the jury polled. Accordingly, the trial court polled the jury. The poll revealed that the verdict was unanimous. Then, the trial court brought Neal before the bench and stated, "Mr. Neal, the jury has found you guilty of murder . . . the law is that I sentence you to life in prison and I order at this time pronounce that as your sentence and you will be sentenced to the State Department of Corrections for the rest of your life." The verdict was filed and entered of record, and the trial court entered a judgment of conviction and sentence that set forth the jury's verdict.

¶48. It is clear from these proceedings, which were in full compliance with Rule 3.10, that Neal was validly convicted "by a verdict of the jury accepted and recorded in court." Miss. Code Ann. § 99-19-3(1) (Rev. 2007). The trial court did not have to state expressly that the court accepted the verdict in order to effect Neal's conviction. *Id.* Neal cites no authority that would support such a requirement; the cases he cites, **State v. Taylor**, 544 So. 2d 1387 (Miss. 1989) and **McLarty v. State**, 842 So. 2d 590, 596 (Miss. Ct. App. 2003), involve jury polling, which is not an issue in this case. This issue is without merit.

### VIII. WHETHER NEAL WAS ENTITLED TO LESSER-OFFENSE JURY INSTRUCTIONS OF HEAT-OF-PASSION MANSLAUGHTER AND DESECRATION OF A HUMAN CORPSE.

¶49. Neal argues that he was entitled to jury instructions on the lesser offense of heat-of-passion manslaughter, and on the crime of desecration of a human corpse codified at

27

Mississippi Code Section 97-29-25(2).[5] The State prepared jury instructions on heat-of-passion manslaughter, but the trial court denied these instructions upon a determination that they were not warranted by the evidence. Neal did not request that the jury be instructed on heat-of-passion manslaughter, nor did he object when the trial court denied the State's instructions.

¶50.    "An error concerning the refusal of jury instructions 'is procedurally preserved by the mere tendering of the instructions, suggesting that they are correct and asking the Court to submit them to the jury.'" *Rubenstein*, 941 So. 2d at 789 (quoting *Edwards v. State*, 737 So. 2d 275, 310 (Miss. 1999)). It is well established that when error is predicated upon the denial of a jury instruction requested by the defendant, the defendant need not make a contemporaneous objection to the denial in order to preserve the error for appeal. *Green v. State*, 884 So. 2d 733, 736 (Miss. 2004). But when a defendant argues that the trial court erroneously denied a jury instruction requested by the State, ordinarily the defendant must have objected to the denial in order to preserve the issue for appeal. *See Reynolds v. State*,

---

[5] Mississippi Code Section 97-29-25(2)(a) provides that:

> Every person who shall knowingly and willfully dig up, except as otherwise provided by law, or in any way desecrate any corpse or remains of any human being, or cause through word, deed or action the same to happen, shall upon conviction be guilty of a felony and shall be imprisoned for not more than three (3) years or fined not more than Five Thousand Dollars ($5,000.00), or both, in the discretion of the court.

The statute provides an exemption from its provisions for good-faith organ harvesting for transplant and for "any good faith use of a cadaver or body part for medical or scientific education or research." Miss. Code Ann. § 97-29-25(2)(b) (Rev. 2006).

913 So. 2d 290, 298 (Miss. 2005). Without a defense objection to the denial of a jury instruction tendered by the State, we assume that the defendant was satisfied with the trial court's decision to rule adversely to the State.

¶51.    Because Neal did not tender a heat-of-passion-manslaughter jury instruction to the trial court or object to the denial of the State's heat-of-passion-manslaughter jury instructions, he is procedurally barred from arguing on appeal that the jury should have been instructed on heat-of-passion manslaughter. *Rubenstein*, 941 So. 2d at 789; *Reynolds*, 913 So. 2d at 298. Notwithstanding the procedural bar, the trial court correctly found that the evidence did not support a heat-of-passion-manslaughter jury instruction.

¶52.    Heat-of-passion manslaughter requires "a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter." *Hobson v. State*, 730 So. 2d 20, 26-27 (Miss. 1998) (quoting *Tait v. State*, 669 So. 2d 85, 89 (Miss. 1996)). "Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror." *Id*. at 27. "The passion felt by the person committing the act 'should be superinduced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation.'" *Graham v. State*, 582 So. 2d 1014, 1018 (Miss. 1991) (quoting *Barnett v. State*, 563 So. 2d 1377, 1379 (Miss. 1990)).

¶53. There was no evidence that Neal acted upon an immediate and reasonable provocation suddenly giving rise to passion or anger, as required by caselaw. Neal admitted to investigators that he and Cleveland had not quarreled on the day of the murder. The only evidence of Neal's motive to kill Cleveland came from Neal's suspicions that Cleveland possibly had been unfaithful to him and that A.B. was not his son. The evidence was that Neal had been harboring these suspicions for some time prior to the murder. Therefore, the evidence did not support a heat-of-passion-manslaughter jury instruction.

¶54. Neal did not preserve error in the failure to grant a jury instruction on desecration of a human corpse. Neither Neal nor the State requested an instruction on this crime. While Neal argues that the trial court had a duty sua sponte to instruct the jury on desecration of a human corpse, "[a] trial court is not required to sua sponte instruct the jury or suggest jury instructions in addition to what the parties tender." *Wilson v. State*, 936 So. 2d 357, 363 (Miss. 2006) (citing *Conner v. State*, 632 So. 2d 1239, 1254 (Miss. 1993) (overruled on other grounds)). A trial court cannot be held in error for not giving an instruction that was never requested. *Harris*, 861 So. 2d at 1017. As Neal's argument is procedurally barred, we do not address his argument that the crime of desecration of a human corpse is a lesser offense of murder. This issue is without merit.

### IX. WHETHER NEAL IS ENTITLED TO RELIEF BASED ON CUMULATIVE ERROR.

¶55. Neal argues that errors occurred that, considered cumulatively, denied him the right to a fair and impartial trial. In cases in which this Court finds harmless error or error that is

30

not reversible in and of itself, the Court has the discretion to determine on a case-by-case basis whether the errors, considered cumulatively, require reversal due to the resulting cumulative prejudicial effect. *Byrom v. State*, 863 So. 2d 836, 847 (Miss. 2003). This case is not susceptible to cumulative-error analysis because we have determined that no errors occurred. *Ruffin v. State*, 992 So. 2d 1165, 1179 (Miss. 2008). Therefore, this issue is without merit.

### X. WHETHER THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE VERDICT AND WHETHER THE VERDICT WAS AGAINST THE OVERWHELMING EVIDENCE.

¶56. In his final argument, Neal contends that the evidence was insufficient to support the verdict, and that the verdict was against the overwhelming weight of the evidence.

### A. Sufficiency of the evidence.

¶57. When reviewing a challenge to the sufficiency of the evidence, "the critical inquiry is whether the evidence shows 'beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.'" *Bush v. State*, 895 So. 2d 836, 843 (quoting *Carr v. State*, 208 So. 2d 886, 889 (Miss. 1968)). However, this does not require the Court to

> "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (citations omitted) (emphasis in original)). If "the facts and inferences . . . 'point in favor of

31

the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,' the proper remedy is for the appellate court to reverse and render." *Id*. (quoting *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985)). But if the evidence is sufficient to show that reasonable and fair-minded persons, in the exercise of impartial deliberations, might have reached a different conclusion on every element of the offense, while considering the beyond-a-reasonable-doubt standard, "the evidence will be deemed to have been sufficient." *Id*.

¶58.    In order to find Neal guilty of murder, the jury had to conclude beyond a reasonable doubt that Neal had killed Cleveland without the authority of law and with deliberate design to effect her death.  Viewing the evidence in the light most favorable to the verdict, the evidence was sufficient to enable a rational jury to find each of these elements beyond a reasonable doubt.  Neal gave two confessions to the police in which he admitted that he had killed Cleveland, in one confession stating that he had decapitated Cleveland, and in another stating that he had shot her twice in the head and then he had decapitated her.  He further admitted that after killing Cleveland, he had taken steps in an effort to conceal his identity as the killer, such as bleaching Cleveland's body, sending misleading text messages, and disposing of Cleveland's head, the gun, and the knife.  Neal's confession to being the killer was corroborated by the discovery of blood on his shorts and by Neal's uncharacteristic tardiness at work on the afternoon of the murder.  There also was evidence that Neal acted with deliberate design; Neal confessed that he had killed Cleveland due to his mounting suspicion of her infidelity.

*B. Weight of the evidence.*

¶59.     Neal argues that the trial court erred by denying his motion for a new trial because the verdict was against the overwhelming weight of the evidence.  On review of a challenge to the weight of the evidence, this Court will reverse for a new trial only if the trial court's ruling was an abuse of discretion.  ***Miller v. State***, 980 So. 2d 927, 929 (Miss. 2008).  We will not disturb the verdict unless it "is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." ***Bush***, 895 So. 2d 844 (citing ***Herring v. State***, 691 So. 2d 948, 957 (Miss. 1997)).

¶60.     On a motion for new trial, "the court sits as a thirteenth juror.  The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." ***Id***. (quoting ***Amiker v. Drugs for Less, Inc.***, 796 So. 2d 942, 947) (Miss. 2000)).  All "evidence should be weighed in the light most favorable to the verdict." ***Id.*** (citing ***Herring***, 691 So. 2d at 957).  Reversing a verdict because it was against the overwhelming weight of the evidence "does not mean that acquittal was the only proper verdict." ***Id.*** (quoting ***McQueen v. State***, 423 So. 2d 800, 803 (Miss. 1982)).  It simply means that this Court "disagrees with the jury's resolution of the conflicting testimony." ***Id***. "This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves.  Instead, the proper remedy is to grant a new trial." ***Id.***

¶61.     There was ample evidence to support the verdict of guilt in this case.   In his confessions to the murder, Neal gave detailed explanations of what occurred and of his

33

motive. Neal's confessions, along with the testimony of investigating officers set forth above, strongly preponderated in favor of the finding of guilt. We cannot say that the verdict was against the overwhelming weight of the evidence such that a new trial is required in order to avoid a manifest injustice. This issue is without merit.

## CONCLUSION

¶62.     For these reasons, we affirm Neal's conviction of murder and sentence of life in the custody of the Mississippi Department of Corrections.

¶63.     **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH, KITCHENS AND PIERCE, JJ., CONCUR. GRAVES, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. KITCHENS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON AND GRAVES, P.JJ., AND DICKINSON AND CHANDLER, JJ., AND JOINED IN PART BY RANDOLPH, J. LAMAR, J., NOT PARTICIPATING.**

**KITCHENS, JUSTICE, SPECIALLY CONCURRING:**

¶64.     While I agree with the majority's ultimate judgment, I feel obliged to write separately to address a troublesome complication in the indictment.

¶65.     Although the defendant frames the issue in the context of a jury instruction, I cannot overlook the curiously-drafted indictment's coming dangerously close to omitting an essential element of murder: that is, that the defendant killed the victim.[6] As the majority correctly

_____

[6]Even if the defendant did not directly raise the sufficiency of the indictment, or lack thereof, this Court would be required to review the issue under the plain-error doctrine as it affects a fundamental, substantive right.

34

observes, Mississippi Code Section 99-7-37 sets forth explicitly and succinctly all that is necessary to charge an accused person with non-capital murder. Maj. Op. at ¶ 11, n. 3. In this case, however, the drafter of the indictment apparently undertook to improve upon this time-tested, simple, and sufficient language. This indictment alleges that Neal "did willfully, unlawfully, and feloniously *decapitate* Lakeshia Cleveland, a human being; Jermaine Neal acted with the deliberate design to effect the death of Lakeshia Cleveland, in direct violation of Section 97-3-19(1)(a)." (Emphasis added.)

¶66. By failing to track the clear and simple statutory language that has worked for legions of Mississippi prosecutors in thousands of murder cases, the State risked violation of the basic constitutional right that the defendant have notice of the specific charge brought by the grand jury. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . be informed of the nature and cause of the accusation . . . ."); U.S. Const. amend. XIV; Miss. Const. art. 3, § 26 ("In all criminal prosecutions, the accused shall have a right . . . to demand the nature and cause of the accusation . . . ."). Had the defendant demurred to the indictment in this case, a conscientious trial judge likely would have had as much difficulty in not granting it as this writer has had in stopping short of saying that the failure to file such a pleading constituted ineffective assistance of counsel.

¶67. This Court has recognized that, although indictments are to be construed strictly, "a reasonable interpretation of the language employed in stating the offense is always permissible," and the indictment will be sufficient as long as, when read as a whole, "it contains every element of the offense intended to be charged and sufficiently apprises the

35

defendant of what he must be prepared to meet." *Hamilton v. State*, 197 So. 2d 469, 473-74 (Miss. 1967). The majority opinion correctly finds the indictment sufficient "because decapitation is a certainly deadly act when done with the deliberate design to effect the death of a human being." Maj. Op. at ¶ 11, n. 2. Obviously, decapitation is a deadly act only if the victim is still alive when beheaded, and post-mortem decapitation would constitute only mutilation of a corpse, not murder.[7] The indictment is saved, not by the word *decapitate*, but by the words *a human being* and the phrase *to effect the death of*. From this verbiage, it is sufficiently implied that the victim was alive at the time of decapitation, and thus, the decapitation was a "kill[ing] and murder." Miss. Code Ann. § 99-7-37 (Rev. 2007). Thus, in the present case, the indictment as a whole is minimally sufficient to alert the defendant that he is being charged with murder.

¶68.    However, I would caution prosecutors to follow strictly the language found in Section 99-7-37 in order to avoid unnecessary confusion or potential due process violations in noncapital murder cases. The notice provisions contained in our constitutions are a fundamental necessity of our criminal justice system, and the state legislature and this Court have provided a simple but sure recipe for the preparation of non-capital murder indictments. *See* Miss. Code Ann. § 99-7-37 (Rev. 2007); *Winston v. State*, 127 Miss. 477, 485, 90 So. 177, 178 (1921) ("[I]t is expressly provided by statute that it shall be sufficient to charge in an indictment for murder that the defendant did feloniously, wilfully, and of his malice

---

[7]Notably, the autopsy report indicates that this decapitation occurred post-mortem.

36

aforethought, kill and murder the deceased.").  The potential for due process abuses is easily avoided when the State simply tracks the language of Section 99-7-37 in its murder indictments, adding, of course, the name of the decedent, describing him or her as a human being, and concluding in the manner required by Article 6, Section 169 of the Mississippi Constitution of 1890: ". . . and all indictments shall conclude 'against the peace and dignity of the state.'"

**CARLSON AND GRAVES, P.JJ., DICKINSON AND CHANDLER, JJ., JOIN THIS OPINION.  RANDOLPH, J., JOINS THIS OPINION IN PART.**