# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-KA-00959-SCT

*WILLIAM B. WELLS a/k/a WILLIAM WELLS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/23/2016 |
| TRIAL JUDGE: | HON. STEVE S. RATCLIFF, III |
| TRIAL COURT ATTORNEYS: | JOHN W. CHRISTOPHER |
| | MICHAEL GUEST |
| | ERIK GREGORY FARIES |
| | DEWEY KEY ARTHUR |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOHN W. CHRISTOPHER |
| | ERIK GREGORY FARIES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/05/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.    It is undisputed that on August 3, 2015, William B. Wells shot and killed Kendrick

Brown in front of the Madison County Courthouse.  A jury convicted Wells of first degree

murder, but according to Wells, the jury never got to hear *why* he shot Brown, due to the

circuit court's decision to grant several of the State's motions *in limine*.  Wells argues that

the circuit court committed reversible error by granting the motions *in limine*. We disagree, and we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2.     On the morning of August 3, 2015, Attorney Rusty Willard was waiting in front of the Madison County Courthouse for his client Kendrick Brown. Brown arrived and sat down outside with Willard. According to Willard's testimony, as he turned to look at Brown, he saw a man holding a silver semiautomatic gun coming toward them quickly. The man, later identified as Wells, approached Brown, pointed the gun at Brown's chest and screamed at Brown. Brown yelled back: "I didn't do it[.] I didn't do it." Wells then shot Brown in chest, and Brown later died from the gunshot wound. Willard testified that Brown did not make a threatening gesture toward Wells or "do anything that would cause someone to shoot him at that time[.]" Madison County Sheriff's Department Deputy Jesse Smith testified that he was working inside the courthouse on the morning of the incident. He was alerted to the shooting, and when he went outside, he saw Wells, standing over Brown's body, still pointing a gun at Brown. Wells immediately complied with Deputy Smith's requests to drop the gun and to lie flat on the ground. He did not attempt to flee or resist arrest.

¶3.     Prior to trial, the State filed several motions *in limine*, and on February 16, 2016, the circuit court heard arguments on four motions. A few days later, the State filed a fifth motion *in limine*. The circuit court granted all of the motions *in limine*, but only four of the five are at issue here. The first motion sought to prohibit Wells from eliciting testimony about any statements that he made "at or near the time of the shooting." Wells urged that the circuit

2

court "just keep this motion open, carry it with the case, and then . . . determine whether or not we have laid a proper foundation to make the statement admissible as an excited utterance . . . under [Rule ] 803(2), or it could qualify as a statement that was made by [Wells] in relation to express his fear, which would also be admissible under [Rule] 803(3)[.]" The next motion involved prohibiting any references to Brown's prior felony convictions for the possession or sale of controlled substances. The State explained that Wells could use the fact that Brown was a drug dealer who had sold drugs to Sherry Wells, Wells's mother, while she was acting as a confidential informant, just not Brown's prior convictions. Wells countered that Brown's convictions were relevant and added probative value because they showed that Brown was the type of person who would put out a hit on Sherry to avoid going back to prison. Next, the State sought to exclude statements regarding warnings, via phone calls from unidentified individuals, that Brown had put a hit on Sherry. The State argued that such statements amounted to double hearsay with no applicable exceptions to get both statements into evidence. Wells explained that a phone call he received from "Bird" and "Bear" is admissible under Rule 803(3) to show his state of mind when he shot Brown and also under Rule 803(24) to show Brown's intent.[1] The State's final motion *in limine* hearing was held several days later. Arguing that the evidence was irrelevant, was hearsay, and was more prejudicial than probative, the State sought to exclude the testimony of a defense witness expected to testify that Brown tried to get him to kill Sherry. Wells argued that the evidence was relevant pursuant to Rule 404(b) as motive of

---

[1] The real names of "Bird" and "Bear" are never disclosed in the record.

Brown to kill Sherry and perspective to show Wells's fearful state of mind and the effect of the statement on him. Wells further explained that the evidence was not being offered to prove the truth of the matter asserted, but it was being offered only for the fact that it was said at all.

¶4. The following describes the excluded evidence that Wells proffered at trial. Wells proffered the testimony of Canton's Chief of Police Otha Brown. Chief Brown testified that on August 1, 2015, he received a call that a tall black male had shot into Sherry Wells's vehicle as she was driving to work. Sherry received gunshot wounds in her legs but survived the shooting. On cross-examination, the State asked Chief Brown if "the only way in which Kendrick Brown was associated with the shooting would have been if Kendrick Brown would have inquired or attempted to get somebody to shoot Ms. Wells because clearly he was not the shooter [based on the description given of the shooter and the police department's investigation]." Chief Brown agreed. Wells, through his attorney, proffered the testimony of his mother, Sherry Wells. According to Wells, Sherry's testimony would have been that she was a confidential informant involved in drug buys from area drug dealers that resulted in the indictment of, among others, Brown. After the indictments, Sherry began receiving threats from Brown and another individual named Dexter Jackson. For example, while Sherry was working the graveyard shift at the Motel 8, Brown would drive into the parking lot around 2:00 to 3:00 a.m. about once a week and position his vehicle so Sherry could see him. He then would stare at her, make a gun shape with his hand, point it at her, and mouth "bang, bang." Sherry became fearful for her life and would not leave the house. She parked

4

behind her house instead of on the side so her vehicle would not be visible from the street. Everything came to a head on the night of August 1, 2015, when she was driving to work and someone shot out her windshield and back window.[2] Sherry confided in Wells about her fears and the threats, which "only heightened his fear."

¶5. Next, Wells, through his attorney, submitted his proffer. He did not take the stand. Wells explained that beginning in February 2015, "he began to hear on the street that his mama . . . had been serving as a snitch for the narcs and had set up some of the drug dealers in town and they were out to get her." The information heightened Wells's fears and anxiety. Then, in April 2015, Wells received a call from his father that someone had broken into Sherry's house by kicking in the back door. Nothing was taken or destroyed, but "[t]he only thing that was disturbed was the clothes hanging in the closet that had been moved around" implying that the person was looking for someone hiding in the closet. Several months later, Dexter Jackson, a drug dealer from whom Sherry had bought drugs as a confidential informant, bought the house next to Sherry's house and began threatening her from across the shared fence. Finally, Wells heard directly from "Bird" that Brown offered him and "Bear" money to kill Sherry. Meanwhile, Wells had remained in contact with members of the Madison County Sheriff's Department regarding the threats and his concern for his mother. After Sherry was injured in the shooting, Wells again contacted the sheriff's department, and he was told to be at the courthouse the following Monday to make arrangements for Sherry to move to a safe house. According to Wells, he came to the

_____

[2] The record indicates that the gunman had not been identified nor had he been definitively linked to Brown.

courthouse on the day of the incident to meet with Deputy Trey Curtis about the safe house and that he did not come to the courthouse looking for Brown. However, when he drove through the parking lot and "happened to see Kendrick Brown . . . all the pinned up fear and emotions of the past [eight] to [ten] months just rose to the front and in that instant [Wells] thought the only way [to] protect my mom is to get ride of this guy because he's trying to kill her." Lastly, Wells said that "his movement between the vehicle and time he shot Brown was kind of a blur." After proffering Brown's court file, Wells rested.

¶6.     The jury received instructions regarding first degree murder and second degree murder. Wells offered an instruction on self defense/defense of others, but the circuit court denied the instruction based on the lack of evidence to support the instruction. Wells did not request a manslaughter instruction. Ultimately, the jury found Wells guilty of first degree murder. Wells filed a motion for a new trial, which the circuit court denied.

¶7.     On appeal, Wells raises the following issues:[3]

I.      Whether the circuit court violated Wells's due process rights when its *in limine* orders denied Wells the fair opportunity to defend himself against the State's accusations.

II.     Whether the circuit court deprived Wells of his fundamental right to assert his theory of self defense.

III.    Whether the circuit court erroneously defined self defense.

IV.     Whether the circuit court erred when it barred Wells's theory of the case as to manslaughter.

V.      Whether the circuit court erred when it granted the four motions *in limine*.

---

[3] Several issues are consolidated.

6

## ANALYSIS

### I. Self Defense/Defense of Others

¶8.    The established standard of review for the admission or exclusion of evidence is whether the trial court abused its discretion. *Evans v. State*, 25 So. 3d 1054, 1057 (¶6) (Miss. 2010). Motions *in limine* should be granted only in situations where "the material or evidence in question will be inadmissible at a trial under the rules of evidence" and the "mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury." *Id.* (citing *Whittley v. City of Meridian*, 530 So. 2d 1341, 1344 (Miss. 1988)). "Before granting a motion *in limine,* courts must be certain that such action will not unduly restrict opposing party's presentation of its case." *Whittley*, 530 So. 2d at 1344.

¶9.    The circuit court's decision to grant the motions *in limine* centers on the following three evidentiary rules. First, Mississippi Rule of Evidence 401 states:

> Evidence is relevant if:
>
> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
>
> (b) the fact is of consequence in determining the case.

Mississippi Rule of Evidence 402, in pertinent part, explains that "[i]rrelevant evidence is not admissible." Finally, Mississippi Rule of Evidence 403 permits the trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

7

¶10.    Several times during the pretrial hearing, the circuit court, in trying to determine the relevance of the evidence, asked and then implored Wells for more information regarding his possible defenses so it could review the motions *in limine*.  Wells declined to provide a proffer or any other information because he did not want to reveal any of his defenses prior to trial.  The circuit court later summarized as follows:

> What's been presented to me today is that the Defendant Mr. Wells believed that the victim or someone under order by the victim shot the Defendant's mother . . . in an attempt to kill her. . . . [T]wo days later [Brown] was sitting outside the courthouse and the Defendant came up to the victim and shot him and killed him outside [of] the courthouse.
>
> Although the terms were not used but certainly some terminology was used talking about the state of mind, the fear of the family, certainly to raise in the [c]ourt's mind that [Wells] is talking about self-defense and defense of others and possibly even heat of passion . . . .  I don't remember the terminology he used, but he didn't intend to shoot him when he walked up, when he came to the courthouse but there he was and it all just hit him all at once.
>
> The problem is that there has been nothing offered here today to show me any type of [imminent] danger like the State has said, any type of [imminent] threat, serious bodily harm at the hands of the victim.  Certainly not when we're talking about [imminent], we're talking about at the time of the shooting. . . . [Imminent] means immediate, and we can go on and on and on for that, but there's been nothing that's been given to me today that certainly advances that premise.   There's no state of, at least what I can see, uncontrollable or any violent rage that was caused by any [imminent] act or any immediate act by the victim.

On February 22, 2016, the circuit court heard the State's final motion *in limine* and explained its ruling that "allowing a self-defense argument to go to the jury, I believe it would be more prejudicial than probative.  I believe it would confuse the issues, and I'm not going to allow it.  There's been no showing to this [c]ourt that the victim's alleged prior acts . . . mainly the shooting of the Defendant's mother – is relevant at all."  The circuit court then reaffirmed

8

its decision at trial. Thus, the circuit court determined that under Rule 402 the evidence was not relevant, making it inadmissible, but even if it was relevant, the circuit court explained that under Rule 403, admitting the evidence would be more prejudicial than probative as it likely would confuse the jury.

¶11.    Wells's theory of defense appeared to be justifiable homicide, largely focused on the self defense/defense of another pursuant to Mississippi Code Section 97-3-15(1)(f) (emphasis added), which provides:

> The killing of a human being by the act, procurement or omission of another shall be justifiable in the following cases:
>
>> (f) When committed in the lawful defense of one's own person *or any other human being*, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be *imminent danger* of such design being accomplished[.]

Miss. Code Ann. § 97-3-15(1)(f) (Supp. 2016). The circuit court explained that Wells's theory hinged on whether he and/or Sherry was in "imminent danger." On appeal, Wells claims that the circuit court incorrectly and erroneously defined self defense when granting the motions *in limine*, which in turn violated his due-process right to defend himself and to put on his theory of the case. We disagree and hold that circuit court did not abuse its discretion in granting the State's motions *in limine*, and even had the circuit court denied the motions, the evidence does not support a theory of self defense/defense of others for the reasons stated by the circuit court – i.e., there was no imminent danger at the time Wells shot Brown.

9

¶12. First, "self defense is a legal concept which must be supported by evidence to be available to a defendant in a homicide case." *Wadford v. State*, 385 So. 2d 951, 955 (Miss. 1980). The Court has held that ". . . a killing is justified if the person who kills did so under circumstances which would lead a reasonable person under similar circumstances to conclude she was in imminent danger of death or great bodily harm." *Lentz v. State*, 604 So. 2d 243, 246 (Miss. 1992). Black's Law Dictionary defines imminent danger as "an immediate threat to one's safety that justifies the use of force in self-defense – The danger resulting from an immediate threatened injury sufficient to cause a reasonable and prudent person to defend himself or herself." *Imminent danger*, Black's Law Dictionary (10th ed. 2014). Further, Black's Law Dictionary defines "immediate" as "occurring without delay; instant[.]" *Immediate*, Black's Law Dictionary (10th ed. 2014). Additionally, our caselaw provides that there must be an overt act *at the time* of the incident to justify a claim of self defense. *See Scott v. State*, 56 Miss. 287, 289, 1879 WL 3958 (1879) ("The justification arises out of the perilous situation of the slayer and a necessity to take life in order to extricate himself from imminent, present, and urgent danger to his own life."); *Douglas v. State*, 2 Miss. Dec. 220, 1881 WL 4595 (n.1) (1881) ("In order to justify a killing on the ground of self defense, there must be some overt act, indicating a present intent to kill the party or do him some great personal injury, and the danger of such design being accomplished must be imminent, that is to say, immediate, pressing, and unavoidable at the time of killing."); *Brown v. State*, 88 Miss. 166, 40 So. 737 (1906) (emphasis added) ("[T]estimony of uncommunicated threats and the nature and character of previous difficulties, wantonly provoked by the deceased, is

always admissible, *provided the testimony shows some overt act on the part of the deceased at the time of the fatal encounter.*"); ***James v. State***, 139 Miss. 521, 104 So. 301 (1925) (emphasis added) ("There must have been in addition, *at the time of the homicide*, an overt act on the part of the deceased indicating a purpose to carry out such threat."), ***Folks v. State***, 230 Miss. 217, 222, 92 So. 2d 463 (1957) (emphasis added) ("[T]hat he was in either real or apparent danger of death or great bodily harm at the hands of the deceased *at the time* he shot him."). We cannot see how the circuit court's interpretation and definition of self defense and the word "imminent" deviate at all from our caselaw.

¶13.    It is undisputed that Wells approached an unarmed Brown from behind, began yelling at him, and shot Brown, who had his arms in the air.    There was no overt act at the time Wells shot Brown that could indicate danger of death or great bodily harm at the moment.

¶14.    Wells's claim that he was defending his mother also fails because, in ***Maye v. State***, 49 So. 3d 1124, 1130 (¶13) (Miss. 2010), the Court held that the "mere presence" of a third party does not entitle a defendant to an instruction on self defense/defense of others. Instead, "[t]he third party must be exposed to some real and apparent danger *when the defendant acts*." ***Id.*** (emphasis added).  More than fifty years prior to the Court's ***Maye*** decision, the Court held in ***Folks v. State***, 230 Miss. 217, 92 So. 2d 461, 462-63 (1957), that the defendant was not entitled to a defense-of-others instruction when the victim had retreated almost twenty feet from the third party at the time the defendant shot the victim.  Here, Wells's mother was not even on the premises.  Thus, at the time Wells shot Brown, neither Wells nor his mother was in any imminent danger.

11

¶15. Again, "self defense is a legal concept which must be supported by evidence to be available to a defendant in a homicide case." *Wadford*, 385 So. 2d at 955. For Wells to present a theory on self defense, it must be supported by evidence, which it was not. Because self defense was not available to Wells as a defense, the evidence of Sherry's shooting was not relevant and allowing the evidence to be introduced certainly would have confused the jury. We hold that the circuit court did not abuse its discretion in granting the State's motions *in limine*.

## II.     Manslaughter

¶16. Wells also claims that the circuit court's decision to grant the motions *in limine* prevented him from presenting his manslaughter defense. The extent of what could be construed as a manslaughter defense is found in Wells's proffer at trial where he stated that when he saw Brown "all the pinned up fear and emotions of the past [eight] to [ten] months just rose to the front and in that instant [Wells] thought the only way I could protect my mom is to get rid of this guy because he's trying to kill her." Just as above in regard to self defense, even had the evidence been admitted, a manslaughter instruction[4] would not have been supported by the evidence.

¶17. The following is well-settled in regard to manslaughter:

> Heat-of-passion manslaughter requires "a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter." *Hobson v. State*, 730 So. 2d 20, 26–27 (Miss. 1998) (quoting *Tait v. State*, 669 So. 2d 85, 89 (Miss. 1996)). "Passion or anger suddenly aroused at the time by some

---

[4] Wells did not request a manslaughter instruction at trial as he did with self defense instructions.

12

immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror." *Id.* at 27. "The passion felt by the person committing the act 'should be superinduced by some insult, provocation, or injury, which would naturally and instantly produce, in the minds of ordinarily constituted men, the highest degree of exasperation.'" *Graham v. State*, 582 So. 2d 1014, 1018 (Miss. 1991) (quoting *Barnett v. State*, 563 So. 2d 1377, 1379 (Miss. 1990)).

*Neal v. State*, 15 So. 3d 388, 408 (¶52) (Miss. 2009). In *Neal*, the Court explained that Neal was not entitled to a manslaughter instruction because "[t]here was not evidence that Neal acted upon an immediate and reasonable provocation suddenly giving rise to passion or anger, as required by case law." *Id.* at 408 (¶ 53). Further, "[t]he only evidence of Neal's motive to kill Cleveland came from Neal's suspicions that Cleveland had been unfaithful to him and that A.B. was not his son. The evidence was that Neal had been harboring these suspicions for some time prior to the murder." *Id.* at 408-409 (¶ 54).

¶18. Similarly, in the present case, the circuit court, on several occasions, explained that Wells had not provided any evidence that he was in "any state of violent rage or any uncontrollable rage at the time of the shooting which would require a separate defense of heat of passion if there was one." At the time Wells shot Brown, Brown was simply standing there with his back toward Wells and said only "I didn't do it" in response to what Wells was yelling at him. There was no immediate provocation. Again, we cannot see how the circuit court abused its discretion.

## CONCLUSION

¶19. As the circuit court pointed out: "We live in a civilized society. We live in a civilized community. We've got to obey laws. We've got to abide by them, and allowing any type

13

of self-defense argument in this case would be tantamount to living in the Old West." Wells shot Brown based on pure speculation and word of mouth that Brown wanted Sherry killed. In fact, others had threatened Sherry and had a motive to shoot Sherry based on her activities as a confidential informant. While balancing the importance of protecting confidential informants, it is a dangerous precedent that reliance on such tenuous information could be enough to justify someone taking the life of another.

¶20.     Though Wells claims that he was denied his opportunity to present his theory or theories of his case, Wells argues only that the evidence was relevant to show his state of mind at the time he shot Brown, but proving his state of mind alone does not make the evidence admissible when he did not present the circuit court any evidence or authority that would make self defense/defense of others or manslaughter viable defenses. Because the self defense/defense of others and manslaughter defenses were not viable, the circuit court correctly determined that the evidence was not relevant, and even if it was relevant, allowing the evidence at trial would serve only to confuse the issues and the jury. We affirm the judgment of the Madison County Circuit Court.

¶21.     **AFFIRMED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. ISHEE, J., NOT PARTICIPATING.**