# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00482-COA

**CHRISTOPHER WALKER**                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                   **APPELLEE**

DATE OF JUDGMENT:               04/22/2022
TRIAL JUDGE:                    HON. JON MARK WEATHERS
COURT FROM WHICH APPEALED:      FORREST COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         OFFICE OF STATE PUBLIC DEFENDER
                                BY: MOLLIE MARIE McMILLIN
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:              PATRICIA A. THOMAS BURCHELL
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 10/31/2023
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     On April 22, 2022, Christopher Walker was convicted of two counts of touching a child for lustful purposes (Counts I and II) and one count of exploitation (Count III).[1] Walker was sentenced to serve fifteen years in custody for each conviction, and they were ordered to run consecutively, totaling forty-five years. He was also ordered to pay a $50,000 fine for the conviction of exploitation. Walker now appeals, asserting that there was insufficient evidence to convict him of exploitation and that the trial court erred by giving

---

[1] Counts I and II were in violation of Mississippi Code Annotated section 97-5-23(1) (Rev. 2020). Count III was in violation of sections 97-7-1 (Rev. 2020) and 97-5-33(6) (Rev. 2020).

a jury instruction defining "sexual conduct." Upon review, we find no error and therefore affirm.

## FACTUAL BACKGROUND

¶2. Christopher Walker married Monica Walker in the fall of 2020. Walker had five children from previous relationships, and Monica had two children. The only children who were minors at the time of the couple's marriage were Walker's daughter D.W. and Monica's daughters A.C. and C.T.[2] Walker, Monica, D.W., A.C., and C.T. began living together.[3] Monica worked as a night-shift cashier at a convenience store. Walker was unemployed and watched the children when Monica worked.

¶3. On June 5, 2021, D.W., age seventeen, woke up to several messages from Walker. D.W. showed the messages to her step-sisters A.C. and C.T. The chain of messages, twelve in total, have been combined here and read as follows:

> I want your p*ssy. I think we should f*ck. You think I don't care but the truth is I want to f*ck you and I know it's wrong. Please don't tell anyone. I know I'm weird and shouldn't think that way but I can't help it. I want you. If you tell[,] you will destroy me mentally. But I think you are beautiful and I know it's wrong but I can't help it[.] I want you[.] That's why I'm an asshole to you. I am trying to push you away because I know I am wrong but if you said yes[,] I would not be able to hold back. Please don't tell on me. I just wanted you to know why I'm an asshole to you. Please don't tell. I'm still drunk but I know what I feel and I know it's wrong but I still want you. Please don't tell[.] You should delete these messages. I'm gonna. Please tell me what you are thinking. I'm sorry. I shouldn't have said anything. Damn it I'm so stupid.

---

[2] The children's names have been substituted with initials in the interest of privacy.

[3] The record suggests that Monica and Walker began living together before the wedding. The children appear to have moved in at another time. D.W.'s brother also appears to have lived in this house, but that fact is not necessary to the determination of the issues presented in this appeal.

I'm sorry for saying anything.

¶4. D.W. called Monica and told her what Walker had done. Monica drove to pick up the three girls, who had stayed with Monica's mother the night before. Monica and the girls immediately went to the police station to report Walker's actions. Walker was arrested for child exploitation at his residence later that day.

¶5. Mississippi Child Protection Services (CPS) made a referral for twelve-year-old A.C. and ten-year-old C.T. because they also lived with Walker. Kid's Hub Child Advocacy Center conducted forensic interviews with A.C. and C.T. D.W. was interviewed by Investigator Jennifer Washington because she was close to the majority age of eighteen. Following the interviews and subsequent investigation, authorities added two counts of touching a child for lustful purposes as to A.C. and C.T. to the existing count of sexual exploitation of D.W. Walker was formally indicted on December 1, 2021.

¶6. Walker's trial began on April 11, 2022. The State first called Monica, who recounted the events of June 5, 2021, when she received a call from D.W. that morning with A.C. and C.T. crying in the background. Monica testified that all three girls were "hysterical." Monica told Walker she was leaving to check on the girls because they had called her "upset and crying over some text messages he had sent to [D.W.]" She stated that Walker was "heavily intoxicated even at that point that early in the morning" and told her that he "didn't do nothing . . . . [He] didn't do anything wrong." Monica informed him she was still going to check on them, and Walker "went into throwing a fit, threatening to kill himself." Monica left the home, and Walker began sending her text messages, "apologizing [and] saying that

3

he wouldn't have done it if it wasn't for the intoxication, that he never meant to hurt any of the children." After picking up the children, Monica took them to the sheriff's department to report Walker.

¶7.    Monica testified that this incident was not the first time she had been made aware of Walker's inappropriate behavior. In March 2021, her children told her that Walker had asked "to touch or see [C.T.'s] vagina." Monica told the children that she would deal with the problem in private. She spoke with Walker and told him "what he had said was inappropriate and wrong" and that "he needed to quit drinking." Monica testified that she did not report this incident to the authorities because she believed "it was just the alcohol talking." Monica also testified A.C. told her in May 2021 that Walker made the girls feel uncomfortable. Monica "assumed it was just his drinking that made them uncomfortable."

¶8.    D.W., who was eighteen years old at the time of the trial, was then called as a witness. She testified that she woke up to her father's sexual text messages on June 5, 2021, and felt "[s]hocked kind of . . . kind of grossed out." D.W. further stated that while the messages were "shocking to see[,]" "it wasn't uncharacteristic" of her father. That same day, Walker also called D.W. and left voicemails. D.W. stated that "[t]he first one he[] ask[ed] [her] for forgiveness kind of in a way. And then the second one he start[ed] blaming [her] and he says . . . like why would you do this to me. I changed your diapers, stuff like that."

¶9.    D.W. also testified about Walker's behavior leading up to the date of his arrest. Walker "drank a bottle of Bourbon every night pretty much." Further, Walker "would get drunk, he would say things and grab us inappropriately and stuff like that and he would say

4

inappropriate things to us." Walker "would say like do you want to have sex and then say it was a joke or say like I'm sexy or say stuff like that to [her] little sisters." She also stated that Walker played video games in the living room and "would get nude mod[ification]s like to make his characters naked and sexual mod[ification]s to make them have sex." "The whole family kind of walked in and out of the living room" so everyone in the family was able to view the "animated sexual activity."

¶10.    D.W. witnessed Walker touch her sisters. She testified that Walker "grabbed [C.T.]'s thigh a few times, grabbed her butt and [A.C.]'s boobs and butt." Walker would always say these things were just a joke. D.W. also stated that Walker "would slap [her] butt and grab [her] butt anytime that [she] bent over to pick something up or get something. He would also grab [her] boobs and stuff like that."

¶11.    A.C., who was thirteen years old at the time of trial, was the State's next witness. She testified that in May 2021, she sat in Walker's lap like she "usually did," but this time he was "touching [her] butt and stuff and [she] was real uncomfortable and [she] told [her] mom." In response, Walker told Monica that "[A.C.] shouldn't be sitting on his lap anymore and if [she's] going to say that, then [she] shouldn't even be around him anymore." A.C. also testified that Walker would "make like hand motions and put his fingers up to his mouth and like flick his tongue between his fingers[,] and he would make sexual jokes like he wanted to have sex and stuff and nudes and stuff like that." He would message her to say "that he wanted [her] to send nudes to him and then he would tell [her] he wanted to have sex and stuff." While A.C. lived with Walker, he touched her "on [her] butt, [her] boobs, and [her]

5

thighs." She also observed Walker "grabbing [C.T.'s] butt[.]"

¶12.    C.T., who was eleven years old at the time of trial, then testified. She testified that Walker "would act weird around [the girls,]" and "sometimes he would pull [them] onto his lap and then once [they] got up, he would slap [their] butts." During spring break in 2021, Walker was drinking and "asked if he could see [C.T.'s] . . . vagina."[4] Walker also "asked if he could touch it" but warned, "[D]on't tell nobody." C.T. told one of her sisters and her mother, Monica, about Walker's comment. When Walker discovered that C.T. had told them, "[h]e walked up to [her] and said, 'I thought I told you not to tell nobody.'" She stated that it was not unusual for him to make sexual jokes when he was drinking. When asked where Walker would touch her, C.T. testified, "He would touch my butt, my thigh, and there was one time when he patted down there."

¶13.    The State also called Riley Herrin, a trained forensic interviewer with Kid's Hub. She was tendered and accepted as an expert in the field of child forensic interviewing. On June 10, 2021, Herrin interviewed both A.C. and C.T. after receiving a referral arising from Walker's case. Due to the Mississippi Rules of Evidence, A.C.'s interview was not discussed at trial; a discussion of C.T.'s interview was permitted due to the tender-years exception.[5]

_____

    [4]  C.T. clarified that Walker used "another word" for vagina that she was uncomfortable saying aloud.

    [5]  The tender-years exception, listed as Rule 803(25) of the Mississippi Rules of Evidence, states:

> A statement by a child of tender years describing any act of sexual contact with or by another is admissible if:
>         (A) the court—after a hearing outside the jury's presence—determines that the statement's time, content, and circumstances provide

6

The video recording of C.T.'s interview with Herrin was played for the jury.[6] Herrin noted the "minimizing language" used by C.T. in the video suggesting Walker's actions were not "intentional or purposeful because he [said] it was a joke." Herrin noted that C.T. "was consistent with other children" who had experienced sexual abuse at home and had made a disclosure. The interview's summary was then sent to law enforcement.

¶14. The State also called law enforcement officers involved with Walker's case to testify. Deputy Scott Lees, who initially arrested Walker at his residence, testified that Walker's cell phone was seized at the scene. Without objection, the cell phone was entered into evidence. Investigator Michael Wahl also testified as a certified operator of Cellebrite, the State's system used to perform forensic extractions of cell phones, also known as "phone dumps." The phone dump of Walker's device was entered into evidence without objection.

¶15. Finally, the State called Investigator Jennifer Washington with the Forrest County Sheriff's Office, who was assigned the case in June of 2021. Washington developed probable cause to arrest Walker based on the text messages he had sent to D.W. and issued a warrant for his arrest. Washington conducted an interview with D.W. and was able to witness A.C. and C.T.'s forensic interviews at Kid's Hub. After examining all the evidence, Washington added the two charges of lustful touching to the existing charge of child

---

substantial indicia of reliability; and
(B) the child either:
    (i) testifies; or
    (ii) is unavailable as a witness, and other evidence corroborates
    the act.

[6] The State began the interview at the twenty-six-minute mark because the beginning was primarily about Herrin building a rapport with C.T.

exploitation. She testified about the substance of Walker's "phone dump," including a message he sent to A.C. asking her to "send nudes." Washington testified that Walker left voice messages for Monica and D.W. on the date of his arrest, generally apologizing and promising he would never do "it" again. He also left angry voice messages for them, including one to D.W. stating that he "changed [her] diapers[,] . . . took care of [her for her] entire life," and now, he has "f*cked up one time" and she "won't talk to [him.]" The pertinent messages, five in total, were played for the jury in their entirety.

¶16. Walker called no witnesses in his defense. After deliberating, the jury found Walker guilty of all three charged counts. He was sentenced to serve fifteen years for each count, to be served consecutively, totaling forty-five years in custody. Walker now appeals.

**ANALYSIS**

¶17. Walker argues that (1) the evidence was insufficient to support his conviction of exploitation, and (2) the trial court erred in instructing the jury on the definition of "sexual conduct."

### I. Sufficiency of the Evidence

¶18. This Court applies a de novo standard of review to challenges to the sufficiency of the evidence. *Tubwell v. State*, 359 So. 3d 249, 250 (¶5) (Miss. Ct. App. 2023) (citing *Sims v. State*, 329 So. 3d 528, 534 (¶20) (Miss. Ct. App. 2021)). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the [requisite] elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010). In so doing,

8

"this Court views the evidence in the light most favorable to the State to determine if any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Benthall v. State*, 311 So. 3d 697, 703 (¶20) (Miss. Ct. App. 2021) (citing *Martin v. State*, 214 So. 3d 217, 222 (¶15) (Miss. 2017)). This Court "will reverse and render if the facts and inferences favor the defendant with such force that reasonable jurors could not find him guilty beyond a reasonable doubt." *Melendez v. State*, 354 So. 3d 944, 952 (¶30) (Miss. Ct. App. 2023) (quoting *Smoots v. State*, 310 So. 3d 1184, 1189 (¶17) (Miss. Ct. App. 2020)). But "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[,]" we will affirm. *Id.*

¶19.    Walker contends that the State's evidence presented in support of a conviction of exploitation was insufficient. He does not contest his convictions of the two counts of touching a child with lustful purposes. The jury was instructed that to find Walker guilty of exploitation, it had to find beyond a reasonable doubt that he

> knowingly and unlawfully persuade[d], seduce[d], or solicit[ed] D.W., who
> was less than 18 years old, to meet [him] in order to engage in sexual conduct,
> by messaging D.W. that he wanted to engage in sexual activity with her.

There was sufficient evidence entered into the record through which a rational juror could find beyond a reasonable doubt that Walker sent text messages in an effort to persuade D.W. to engage in sexual activity with him. The messages stated, "I want your p*ssy. I think we should f*ck . . . the truth is I want to f*ck you" along with "but if you said yes[,] I would not be able to hold back."

¶20.    The jury was able to view the screenshots of these messages. The messages came

from a contact named "Daddy" in D.W.'s phone, and D.W. confirmed in her testimony that the number belonged to Walker. Walker's argument on appeal rests primarily on the fact that the messages at issue were not produced in the phone dump. But Walker plainly stated in the messages to D.W., "You should delete these messages. I'm gonna." Further, Investigator Wahl's testimony explained that the Cellebrite technology used for the phone dump did not provide him with a report of deleted messages.[7] In other words, Wahl "cannot say if something was or was not deleted." A reasonable juror could rationally conclude that Walker deleted the sexual text messages from his phone.

¶21. The jury was also presented with the first-hand testimony of D.W., the message recipient, as well as the testimonies of A.C. and Monica, who viewed the messages on D.W.'s phone. When a defendant challenges the sufficiency of the evidence on appeal, we do not "assume[] the role of juror on appeal. We do not reweigh evidence. We do not assess witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *McCarty v. State*, 247 So. 3d 260, 269 (¶25) (Miss. Ct. App. 2017) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)). It is clear from the record on appeal that a rational juror could have found Walker guilty beyond a reasonable doubt on all elements of the crime of exploitation.

## II.    Jury Instructions

---

[7] Wahl stated in his testimony that a physical extraction dump may recover deleted items on a phone. However, a physical extraction is only available for certain types of phones. In Walker's case, a physical extraction was not available. Wahl instead performed an "advanced logical" dump, meaning the deleted messages were not recovered.

¶22.	Walker additionally argues that the trial court erred by giving a jury instruction that defined "sexual conduct."  The instruction read as follows:

> The Court now instructs you that "sexual conduct" means real or pretend (1) oral genital contact, oral anal conduct, or sexual intercourse between people of the same or opposite sex; (2) bestiality; (3) masturbation; (4) sadistic or masochistic abuse; (5) sexually showing the genitals or pubic area of any person; or (6) sexually touching the genitals, pubic area, buttocks, anus, or breast.

Walker first contends that this instruction did not properly track the language of the corresponding statute.  That statute defines "sexually explicit conduct":

> [A]ctual or simulated: (i) Oral genital conduct, oral anal conduct, or sexual intercourse as defined in Section 97-3-65, whether between persons of the same or opposite sex; (ii) Bestiality; (iii) Masturbation; (iv) Sadistic or masochistic abuse; (v) Lascivious exhibition of the genitals or pubic area of any person; or (vi) Fondling or other erotic touching of the genitals, pubic area, buttocks, anus[,] or breast.

Miss. Code Ann. § 97-5-31(b) (Rev. 2014).

¶23.	Notably, Walker did not object to this instruction when given the opportunity at trial. While the jury instruction conference in this case was held off the record and later recapped by the judge into the record, Walker did not object to the instruction at either time.  This Court has long held that "[t]o preserve a jury instruction issue on appeal, the defendant must make a specific objection to the proposed instruction to allow the trial court to consider the issue."  *E.g.*, *Sands v. State*, 315 So. 3d 1066, 1070 (¶10) (Miss. Ct. App. 2020) (quoting *Harris v. State*, 861 So. 2d 1003, 1013 (¶18) (Miss. 2003)); *accord Crawford v. State*, 787 So. 2d 1236, 1244-45 (¶34) (Miss. 2001).

¶24.	The *only* alternative to this rule is plain-error review, which "is to be 'used sparingly,

11

solely in those circumstances in which a miscarriage of justice would otherwise result.'" *Cozart v. State*, 226 So. 3d 574, 581 (¶23) (Miss. 2017) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)). "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Hollingsworth v. State*, 269 So. 3d 456, 459 (¶8) (Miss. Ct. App. 2018) (quoting *Johnson v. State*, 155 So. 3d 733, 738-39 (¶8) (Miss. 2014)). "The plain error doctrine is employed only in situations when a defendant's substantive or fundamental rights are affected." *Green v. State*, 183 So. 3d 28, 31 (¶6) (Miss. 2016) (internal quotation marks omitted) (quoting *Flora v. State*, 925 So. 2d 797, 811 (¶42) (Miss. 2006)). "[T]o determine if plain error has occurred, we must determine if the trial court has deviated from a legal rule, whether that error is plain, clear[,] or obvious, and whether the error has prejudiced the outcome of the trial." *Id.* (citing *Neal v. State*, 15 So. 3d 388, 403 (¶32) (Miss. 2009)). So for this Court to apply the plain-error doctrine, we must first determine if an error (a deviation from a legal rule) involving the jury instructions occurred at all.

¶25. "When jury instructions are challenged on appeal, we are mindful that trial courts are given considerable discretion regarding the instructions' form and substance." *McNeer v. State*, 307 So. 3d 508, 513-14 (¶12) (Miss. Ct. App. 2020) (quoting *Roberson v. State*, 19 So. 3d 95, 99 (¶3) (Miss. Ct. App. 2009)). Further, "[i]t is well settled that the standard of review for the giving or refusing of jury instructions is an abuse of discretion." *Id.* (citing *Taylor v. State*, 109 So. 3d 589, 595 (¶18) (Miss. Ct. App. 2013)). "When reviewing the

giving or refusal of jury instructions, we do not view the jury instructions in isolation, but instead we consider them as a whole." *Taylor*, 109 So. 3d at 595 (¶18) (citing *Rushing v. State*, 911 So. 2d 526, 537 (¶24) (Miss. 2005)). "[I]f all instructions fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." *Cooper v. State*, 230 So. 3d 1071, 1077 (¶19) (Miss. Ct. App. 2017) (internal quotation marks omitted) (quoting *Crook v. State*, 105 So. 3d 353, 358 (¶13) (Miss. Ct. App. 2012)).

¶26.    Walker's first contention of error with the definition instruction is that it used the word "pretend" in place of the word "simulated," as found in the statutory definition. Miss. Code Ann. § 97-5-31(b). Mississippi law "does not require jury instructions to be perfectly worded, so long as the instructions as a whole fairly instruct the jury and create no injustice." *Baxter v. State*, 177 So. 3d 394, 401 (¶21) (Miss. 2015) (citing *Wilson v. State*, 967 So. 2d 32, 36-37 (¶11) (Miss. 2007)). The New Oxford American Dictionary defines "pretend" as "giv[ing] the appearance of feeling or possessing (an emotion or quality)" or "speak[ing] and act[ing] so as to make it appear that something is the case when in fact it is not."[8] Conversely, "simulated" is defined as "pretended or feigned."[9] The difference between the two words is so minute, so insignificant, that this Court cannot find that it would have misled the jury in reaching a verdict. Again, "jury instructions do not have to be perfect[;] they only have to fairly announce the applicable rule of law." *Mitchell v. State*, 327 So. 3d 142, 155 (¶66) (Miss. Ct. App. 2021) (quoting *Brown v. State*, 19 So. 3d 85, 92 (¶18) (Miss. Ct. App.

---

[8]    *Pretend*, New Oxford American Dictionary 1384 (3d ed. 2010).

[9]    *Simulated*, New Oxford American Dictionary 1630 (3d ed. 2010).

2008)). The definition instruction used at Walker's trial sufficiently instructed the jury and, as a whole, fairly announced the correct statement of the law. This issue is without merit.

¶27. Walker also asserts that the trial court erred by giving the "sexual conduct" definition instruction without indicating that the definition given applied specifically to the crime of sexual exploitation. Pointedly, he argues that the inclusion of "real or pretend conduct" in the definition of sexual conduct "could be interpreted by the jury as allowing them to convict Walker of touching a child for lustful purposes in Counts I and II if it found that [he] pretended to touch [C.T.] and [A.C.] in a sexual way." Walker argues that this given definition was "especially prejudicial" because of the testimony that "Walker would often say things and then tell the children he was just joking."

¶28. The exploitation-elements instruction read:

> The Defendant, CHRISTOPHER WALKER, has been charged in Count III with the crime of Child Exploitation. If you find beyond a reasonable doubt from the evidence in this case that:
>
> 1. On or about June 5, 2021, in Forrest County, Mississippi;
> 2. CHRISTOPHER WALKER [did] knowingly and unlawfully persuade, seduce, or solicit D.W., who was less than 18 years old, to meet CHRISTOPHER WALKER in order to engage in **sexual conduct**, by messaging D.W. that he wanted to engage in sexual activity with her, then you shall find CHRISTOPHER WALKER guilty as charged.
>
> If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the Defendant not guilty of COUNT III: CHILD EXPLOITATION.

(Emphasis added).

¶29. Our review of Walker's contention requires that we read all the jury instructions given as a whole, "with no one instruction to be read alone or taken out of context." *Pulliam v.*

14

*State*, 321 So. 3d 1185, 1193 (¶27) (Miss. Ct. App. 2020) (quoting *Blanden v. State*, 276 So. 3d 1204, 1210 (¶21) (Miss. Ct. App. 2018)). The jury instructions were clear in both counts of "Touching a Child for Lustful Purposes" that actual *touch* was required. Those instructions for Counts I and II specifically stated that the jury had to find beyond a reasonable doubt that Walker "did unlawfully *touch* a minor child . . . who was less than 16 years old, by *touching* her on the buttocks, thighs, or breasts, in order to satisfy his sexual desires or lust" to render a guilty verdict. (Emphasis added). We "presume[] that jurors follow the instructions of the court." *Neal*, 15 So. 3d at 402 (¶30) (quoting *Moore v. State*, 787 So. 2d 1282, 1291 (¶30) (Miss. 2001)). Only the exploitation-elements instruction for Count III contained the term "sexual conduct." Read as a whole, the jury instructions for both counts of touching A.C. and C.T. for lustful purposes required the jury's finding that Walker "touched" the victims. The only inclusion of the phrase "sexual conduct" was in the exploitation instruction. We presume that jurors follow the instructions given by the court—that said, we find that Walker suffered no "manifest injustice" from these instructions.

¶30. Walker failed to object to this jury instructions at trial and is procedurally barred from raising the issue on appeal. Under the plain-error doctrine, we find that the trial court did not violate a known legal rule since the jury instructions, as a whole, announce the applicable rules of law. Therefore, no error occurred. Additionally, the State's evidence used to convict Walker of child exploitation was sufficient. Thus, we affirm each of Walker's convictions and sentences.

15

¶31. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, SMITH AND EMFINGER, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**